**BOND POWER**

FOR VALUE RECEIVED, J.P. Thieriot Investment Group, LLC (the "Company")

*hereby sells, assign and transfers unto*

PLEASE INSERT SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE

94-3328513

the Zero-Coupon Notes due June 15, 2000 issued by AIG Matched Funding Corp., a

Delaware corporation, *standing in the name of the Company on the books of said Corporation*

*represented by Certificates(s) No(s).* _____

*herewith, and do hereby irrevocably constitutes and appoints* : _____

_____ *attorney to transfer the*

*Notes on the books of said Corporation with full power of substitution in the premises.*

*Dated* 3/13/00

J.P. Thieriot Investment Group, LLC

By: _____

~~Juan Pablo Thieriot~~
~~Manager~~ RICHARD T. THIERIOT
AUTHORIZED MEMBER

*In presence of*

JOHN H. MULLEN

*Signature guaranteed,*

John H Mullen

Face of Note

THIS NOTE (OR ITS PREDECESSOR) WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933 (THE *"SECURITIES ACT"*) AND THE TRANSFER OF THIS NOTE IS SUBJECT TO CERTAIN CONDITIONS. THIS NOTE MAY NOT BE OFFERED, SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. THE EXEMPTION PROVIDED BY RULE 144A UNDER THE SECURITIES ACT MAY BE AVAILABLE TO PERMIT SALE OR TRANSFER OF THIS NOTE TO QUALIFIED INSTITUTIONAL BUYERS (WITHIN THE MEANING OF RULE 144A) WITHOUT REGISTRATION.

THE HOLDER OF THIS NOTE AGREES FOR THE BENEFIT OF THE ISSUER THAT SUCH HOLDER WILL NOT OFFER, SELL, PLEDGE, HYPOTHECATE OR OTHERWISE TRANSFER THIS NOTE (WITHOUT THE CONSENT OF THE ISSUER) OTHER THAN (I) TO A "QUALIFIED INSTITUTIONAL BUYER" IN A TRANSACTION COMPLYING WITH RULE 144A UNDER THE SECURITIES ACT, (II) TO A NON-U.S. PERSON IN A TRANSACTION COMPLYING WITH RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, (III) IN A TRANSACTION COMPLYING WITH RULE 144 UNDER THE SECURITIES ACT, OR (IV) OTHERWISE IN ACCORDANCE WITH AN APPLICABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, AND IN ANY CASE IN ACCORDANCE WITH EXEMPTIONS FROM ANY APPLICABLE STATE SECURITIES OR BLUE SKY LAWS; *PROVIDED* THAT IN CONNECTION WITH ANY SUCH TRANSFER, THE ISSUER MAY REQUIRE A SATISFACTORY OPINION OF COUNSEL OR OTHER EVIDENCE WITH RESPECT TO THE PROPOSED TRANSFER.

THE FOREGOING LEGENDS MAY BE REMOVED FROM THIS NOTE ONLY ON THE CONDITIONS SPECIFIED HEREIN.

THE TRANSFER OF THIS NOTE OR ANY INTEREST HEREIN TO A PENSION OR WELFARE PLAN (AS DEFINED IN SECTION 3 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974) OR TO AN INDIVIDUAL RETIREMENT ACCOUNT (AS DEFINED IN SECTION 408 OF THE INTERNAL REVENUE CODE OF 1986) IS SUBJECT TO THE RESTRICTIONS SET FORTH ON THE REVERSE HEREOF. THE HOLDER OF THIS NOTE, BY ITS ACCEPTANCE HEREOF, AGREES TO ABIDE BY SUCH RESTRICTIONS AND TO NOTIFY ANY TRANSFEREE OF THIS NOTE OF SUCH RESTRICTIONS.

## AIG MATCHED FUNDING CORP.

### ZERO COUPON NOTES DUE JUNE 15, 2000

REGISTER NO.:                                          1

PRINCIPAL AMOUNT:                          $302,920.58

ISSUE PRICE                                        $298,197.80

ORIGINAL ISSUE DATE:                      March 14, 2000

MATURITY DATE:                                 June 15, 2000

THIS INSTRUMENT WAS ISSUED WITH ORIGINAL ISSUE DISCOUNT (*"OID"*) WITHIN THE MEANING OF SECTIONS 1273 AND 1275 OF THE UNITED STATES INTERNAL REVENUE CODE OF 1986, AS AMENDED. FOR FURTHER INFORMATION, PLEASE CONTACT THE CHIEF FINANCIAL OFFICER OF AIG MATCHED FUNDING CORP. (203-222-4700), WHO WILL, BEGINNING NO LATER THAN 10 DAYS AFTER THE ORIGINAL ISSUE DATE SET FORTH ABOVE, PROMPTLY PROVIDE TO THE HOLDER OF THIS INSTRUMENT THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE AND YIELD-TO-MATURITY OF THIS INSTRUMENT.

AIG MATCHED FUNDING CORP., a corporation duly organized under the laws of the State of Delaware (herein called the *"Issuer"*), for value received, hereby promises to pay to J.P. THIERIOT INVESTMENT GROUP, LLC or its registered assigns (the *"Holder"*), the principal sum of Three Hundred Two Thousand Nine Hundred Twenty Dollars and Fifty-Eight Cents ($302,920.58) on the Maturity Date set forth above.

Reference is hereby made to the further provisions of this Note set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

IN WITNESS WHEREOF, the Issuer has caused this instrument to be duly executed as of the day and year first above written.

AIG MATCHED FUNDING CORP.

By: _____

Name: Kathleen Furlong

Title: Treasurer

COPY

<u>Reverse of Note</u>

1. *The Notes.* This Note is one of a duly authorized issue of notes of the Issuer, limited in aggregate Principal Amount to $302,920.58 (the *"Notes"*). This Note is an unsecured, direct, unconditional and unsubordinated obligation of the Issuer and will rank equally with all other Notes and all other unsecured and unsubordinated indebtedness of the Issuer.

2. *Guarantee.* Payment of the principal of, and other amounts, if any, payable by the Issuer in respect of, this Note is guaranteed by the American International Group, Inc. (the *"Guarantor"*), pursuant to the Guarantee dated December 4, 1995 (the *"Guarantee"*), a copy of which is attached hereto.

3. *Form and Denomination.* This Note is transferable, in whole or in part, in minimum denominations of $100,000.

4. *Registration, Transfer and Exchange.*

(a) The Issuer shall keep a register (the *"Note Register"*) in which, subject to such reasonable regulations as it may prescribe (including certification as to the exemption from registration under the Securities Act of 1933, as amended (the *"Securities Act"*), being relied upon for transfer) and subject to the limitations set forth on the face of this Note, the Issuer shall provide for the registration of this Note and the registration of transfers and exchanges of this Note. Subject to the foregoing limitations, upon surrender for registration of transfer of this Note at the office of the Issuer specified in Section 13 hereof, the Issuer shall execute and deliver, in the name of the designated transferee or transferees, one or more new Notes of any authorized denominations, of a like aggregate Principal Amount. The Holder of this Note shall be treated as the owner hereof for all purposes.

(b) Each Note presented or surrendered for registration of transfer or exchange shall be duly endorsed by, or be accompanied by a written instrument of transfer in form reasonably satisfactory to the Issuer duly executed by, the Holder thereof or such Holder's attorney duly authorized in writing, with such signature guaranteed by a commercial bank or trust company located, or having a correspondent located, in The City of New York or by a member firm of a national securities exchange.

(c) A Note shall be dated the date of its execution by the Issuer. Each Note delivered upon any transfer or exchange for or in lieu of the whole or any part of this Note shall evidence the same debt and be entitled to the same benefits as the Note or part thereof surrendered upon such registration of transfer or exchange.

(d) No service charge shall be made to a Holder for any registration of transfer or exchange of this Note, but the Issuer may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of this Note.

(e) If this Note is issued upon the transfer, exchange or replacement of another Note that does not bear a legend (the *"Legend"*) setting forth restrictions on transfer that are intended to ensure compliance with the Securities Act, the Note so issued shall not bear the Legend. If this Note is issued upon the transfer, exchange or replacement of another Note that bears the Legend, or if a request is made to remove the Legend on this Note, the Note so issued shall bear the Legend, or the Legend shall not be removed, as the case may be, unless there is delivered to the Issuer such satisfactory evidence as may be required by the Issuer, which may include an opinion of counsel, that neither the Legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof are exempt from or are not subject to the registration requirements under the Securities Act. Upon provision of such satisfactory evidence, the Issuer shall deliver a Note that does not bear the Legend.

(f) The Issuer and any person that constitutes an affiliate of the Issuer (as defined below) may at any time purchase this Note, in whole or in part, in the open market or otherwise at any price to the extent the Holder of this Note has made the same available for purchase. If this Note is so purchased by the Issuer or any such affiliate (including upon any redemption) it shall promptly be canceled and shall not be re-issued or resold. An *"affiliate"* of the Issuer for purposes of this Note shall mean (i) American International Group, Inc. or any subsidiary of American International Group, Inc. or (ii) AIG Financial Products Corp. or any subsidiary of AIG Financial Products Corp.

5. *Interest.* No Interest shall accrue or be paid on this Note. Notwithstanding the foregoing, if the Issuer or the Guarantor shall fail to pay the Principal Amount of any Note at maturity (or the Accreted Value (as defined in Section 7 hereof) upon an acceleration following an Event of Default) then interest shall accrue on such Principal Amount or Accreted Value, as the case may be, at a rate of 6% until the full amount of such Note is paid. Such interest shall be calculated on the basis of a 360-day year consisting of 12 months of 30 days each and, in the case of an incomplete month, the actual number of days elapsed, compounded semi-annually. Any such interest shall be paid by the Issuer or the Guarantor on the same date that the Issuer or the Guarantor pays in full the Principal Amount or the Accreted Value to the Holder(s) of the Note.

6. *Payment.*

(a) *Payment at Maturity.* Payment of the Principal Amount of this Note on the Maturity Date shall be made only upon presentation and surrender of this Note to the Issuer or its duly authorized agent, in either case at a location in The Borough of Manhattan, The

City of New York. Subject to the preceding sentence, payment of the Principal Amount on the Maturity Date shall be made by wire transfer of immediately available funds in U.S. Dollars to a U.S. Dollar account maintained by the Holder hereof with a bank in The City of New York, *provided* that written notice of such account has been given to the Issuer by the Holder not fewer than five Business Days (as defined below) prior to the Maturity Date. In the event that the Maturity Date shall not be a Business Day, payment of the Principal Amount shall be made on the first following day that is a Business Day with the same force and effect as if made on the Maturity Date.

(b) *Certification.* The Issuer shall have the right reasonably to require the Holder of this Note, as a condition of payment of the Principal Amount of this Note on the Maturity Date, to present at such place as the Issuer shall designate in writing a certificate in such form as the Issuer may from time to time prescribe in writing to enable the Issuer to determine its duties and liabilities with respect to (i) any taxes, assessments or governmental charges that the Issuer or any withholding agent may be required to deduct or withhold from payments in respect of this Note under any present or future law of any jurisdiction or any regulation of any taxing authority thereof and (ii) any reporting or other requirements under such laws or regulations. To the extent not otherwise prohibited by applicable laws and regulations, the Issuer shall be entitled to determine its duties and liabilities with respect to such deduction, withholding, reporting or other requirements on the basis of information contained in such certificate, or, if no certificate shall be presented, on the basis of any presumption created by any such law or regulation, and shall be entitled to act in accordance with such determination.

7. *Events of Default.*

(a) The following shall be considered *"Events of Default"*:

(i) default is made in the payment of the aggregate Principal Amount of the Notes when due at the Maturity Date, which default shall remain uncured for a period of two Business Days; or

(ii) for any reason the Guarantee ceases to be in full force and effect or the performance of the Guarantee by the Guarantor becomes unlawful and the Issuer does not provided a replacement absolute guarantee of the Issuer's obligations under this Note within two Business Days; or

(iii) default is made in the performance of any other covenant or agreement contained in this Note, or any such covenant or agreement is breached, for a period of 30 days after the date on which written notice of such default requiring the Issuer to remedy the same and stating that such notice is a *"Notice of Default"* shall first have been given to the

Issuer by the Holders of at least 25% in aggregate Principal Amount of the Notes at the time Outstanding (as defined in Section 16 hereof); or

(iv) a court having jurisdiction in the premises enters (a) a decree or order for relief in respect of the Issuer or the Guarantor in an involuntary case or proceeding under any applicable bankruptcy, insolvency, reorganization or other similar law or (b) a decree or order adjudging the Issuer or the Guarantor a bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Issuer or the Guarantor under any applicable law, or appointing a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of the Issuer or the Guarantor or of any substantial part of the property of the Issuer or the Guarantor, or ordering the winding up or liquidation of the affairs of the Issuer or the Guarantor, *provided* that any such decree or order for relief or any such other decree or order shall continue unstayed and in effect for a period of 90 consecutive days; or

(v) the Issuer or the Guarantor commences a voluntary case or proceeding under any applicable bankruptcy, insolvency, reorganization or other similar law or of any other case or proceeding to be adjudicated a bankrupt or insolvent, or the Issuer or the Guarantor consents to the entry of a decree or order for relief in respect of the Issuer or the Guarantor, as the case may be, in an involuntary case or proceeding under any applicable bankruptcy, insolvency, reorganization or other similar law or to the commencement of any bankruptcy or insolvency case or proceeding against the Issuer or the Guarantor, or the Issuer or the Guarantor files a petition or answer or consent seeking reorganization or relief under any such applicable law, or the Issuer or the Guarantor consents to the filing of such petition or to the appointment of or the taking possession by a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of the Issuer or the Guarantor or of any substantial part of property of either of them, or the Issuer or the Guarantor makes a general assignment for the benefit of creditors.

(b) If any Event of Default (other than an event of default described in clause (iv) or (v) above) shall occur and be continuing, the Holders of Notes representing not less than 25% of the aggregate Principal Amount of the Outstanding Notes may, at such Holders' option, declare the Accreted Value of the Outstanding Notes to be due and payable immediately by written notice to the Issuer, and unless all such defaults shall have been cured by the Issuer prior to receipt of such written notice, the Accreted Value of the Outstanding Note shall become and be immediately due and payable. If an Event of Default specified in clause (iv) or (v) above occurs, the aggregate Accreted Value of the Outstanding Notes shall *ipso facto* become immediately due and payable without any act on the part of any Holder of any Notes.

*"Accreted Value"* means (i) as of any date of determination prior to the Maturity Date, the sum of the Issue Price plus that portion of the OID attributable to the period from the Original Issue Date to the date of acceleration (calculated as set forth in the second sentence of Section 5) and (ii) on or after the Maturity Date, the Principal Amount.

8. *Certain Information.* At any time when neither the Issuer nor the Guarantor is subject to Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, upon the request of a Holder of a Note, the Issuer or the Guarantor shall promptly furnish or cause to be furnished Rule 144A Information (as defined below) to such Holder or to a prospective purchaser of such Note designated by such Holder in order to permit compliance by such Holder with Rule 144A under the Securities Act in connection with the resale of such Note by such Holder; *provided, however,* that the Issuer and the Guarantor shall not be required to furnish such information in connection with any request made on or after the date that is three years after the later of the date this Note (or any predecessor Note) or interest therein was acquired from the Issuer or the date this Note (or any predecessor Note) or interest therein was last acquired from an "affiliate" of the Issuer within the meaning of Rule 144 under the Securities Act; and *provided further, however,* that the Issuer and the Guarantor shall not be required to furnish such information at any time to a prospective purchaser located outside the United States who is not a "U.S. person" within the meaning of Regulation S under the Securities Act. *"Rule 144A Information"* shall be such information with respect to the Guarantor as is specified pursuant to Rule 144A(d)(4) under the Securities Act (or any successor provision thereto).

9. *Meetings and Amendments.*

(a) *Calling of Meeting and Notice.* A meeting of Holders of the Notes may be called at any time and from time to time to make, give or take any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Note to be made, given or taken by Holders of the Notes or to modify, amend or supplement the terms of the Notes as provided below. The Issuer or the Holders of at least 25% in aggregate Principal Amount of the Outstanding Notes (as defined below) may at any time call a meeting of the Holders of the Notes for any such purpose to be held at such time and at such place in the Borough of Manhattan, The City of New York as the Issuer or the Holders shall determine. Notice of every meeting of the Holders of the Notes setting forth the time and the place of such meeting and in general terms the action proposed to be taken at such meeting, shall be given by the Issuer or the Holders calling such meeting, as the case may be, in each case to all Holders of the Notes and the Issuer not less than 30 nor more than 60 days prior to the date fixed for the meeting.

(b) *Quorum.* To be entitled to vote at any meeting of Holders of the Notes, a person shall be a Holder of Outstanding Notes on the record date established as described below. The persons entitled to vote a majority in aggregate Principal Amount of the Outstanding

Notes shall constitute a quorum; *provided, however,* that as to matters set forth in clauses (A) through (E) of subsection (c) of this Section 9 (*"Extraordinary Matters"*), the persons entitled to vote 75% in aggregate Principal Amount of the Outstanding Notes affected by such Extraordinary Matter shall constitute a quorum. At the reconvening of any meeting adjourned for a lack of a quorum, the persons entitled to vote any Principal Amount of the Outstanding Notes shall constitute a quorum for the taking of any action set forth in the notice of the original meeting; *provided, however,* that if the business of the meeting includes action on an Extraordinary Matter, persons entitled to vote a majority in aggregate Principal Amount of the Outstanding Notes shall constitute a quorum. The Issuer, or any agent appointed by it for the purpose, may make such reasonable and customary regulations as it shall deem advisable for any meeting of Holders of the Notes with respect to the appointment of proxies in respect of Holders of the Notes, the record date for determining the registered owners of the Notes who are entitled to vote at such meeting (which date shall be set forth in the notice calling such meeting referred to above and which shall be not less than 30 nor more than 60 days prior to such meeting), the adjournment and chairmanship of such meeting, the appointment and duties of inspectors of votes, the submission and examination of proxies, certificates and other evidence of the right to vote, and such other matters concerning the conduct of the meeting as it shall deem appropriate.

(c) *Approval.* At any meeting of Holders of the Notes duly called and held as specified above, upon the affirmative vote, in person or by proxy thereunto duly authorized in writing, of the Holders of not less than 50% in aggregate Principal Amount of the Outstanding Notes represented at such meeting (or of such other percentage as may be set forth herein with respect to the action being taken), the Issuer may modify, amend or supplement the terms of the Notes, and the Guarantor may modify, amend or supplement the terms of the Guarantee, in any way, and the Holders of the Notes may make, take or give any request, demand, authorization, direction, notice, consent, waiver or other action provided by the Notes or the Guarantee to be made, given or taken by the Holders of the Notes; *provided, however,* that no such action may, without the consent of Holders of 100% in aggregate Principal Amount of the Outstanding Notes, (A) change the due date for the payment of principal of the Notes; (B) reduce the Principal Amount of the Notes, the portion of the Principal Amount that is payable upon acceleration of the maturity of the Notes or the interest rate payable on overdue amounts; (C) change the coin or currency in which or the places at which payment with respect to principal in respect of the Notes is required to be made; (D) alter or amend the Guarantee in any manner adversely affecting the interests of any Holder of Notes; or (E) reduce the proportion of the Principal Amount of the Notes the vote or consent of the Holders of which is necessary to modify, amend or supplement the terms and conditions of the Notes or the Guarantee or to make, take or give any request, demand, authorization, direction, notice, consent, waiver or other action provided hereby or thereby to be made, taken or given. The Issuer and the Guarantor may, without the vote or consent of any Holder of the Notes, amend the Notes or the Guarantee for the purpose of (i) adding to the covenants of the Issuer or the Guarantor, as the case may be, for the benefit

of the Holders of the Notes; (ii) surrendering any right or power conferred upon the Issuer or the Guarantor, as the case may be; (iii) securing the Notes or the Guarantee, as the case may be, pursuant to the requirements of the Notes or the Guarantee, as the case may be, or otherwise; (iv) evidencing the succession of another corporation to the Issuer and the assumption by any such successor of the covenants and obligations of the Issuer in the Notes in accordance with Section 14 hereof; or (v) curing any ambiguity in the terms, or curing, correcting or supplementing any defective provision, of the Notes or the Guarantee, in any manner that the Issuer or the Guarantor may determine shall not be inconsistent with the Notes or the Guarantee, as the case may be, and shall not adversely affect the interest of any Holder of the Notes.

It shall not be necessary for the vote or consent of the Holders of the Notes to approve the particular form of any proposed modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action, but it shall be sufficient if such vote or consent shall approve the substance thereof.

(d) *Binding Nature of Amendments, Notices, Notations, etc.* Any instrument given by or on behalf of any Holder of the Notes in connection with any consent to or vote for any such modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action shall be irrevocable once given and shall be conclusive and binding on all subsequent Holders of such Note or any Note issued directly or indirectly in exchange or substitution therefor or in lieu thereof. Any such modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action shall be conclusive and binding on all Holders of the Notes, whether or not they have given such consent or cast such vote, and whether or not notation of such modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action is made upon the Notes. Notice of any modification or amendment of, supplement to, or request, demand, authorization, direction, notice, consent, waiver or other action with respect to the Notes (other than for purposes of curing any ambiguity or of curing, correcting or supplementing any defective provision hereof or thereof) shall be given to each Holder of the Note affected thereby, in all cases as provided herein.

Any Note delivered after the effectiveness of any such modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action may bear a notation in the form approved by the Issuer as to any matter provided for in such modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action. Any such Note may be prepared by the Issuer as modified to conform, in the opinion of the Issuer, to any such modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action, and delivered in exchange for any Outstanding Notes.

(e) *Action by Consent in Lieu of a Meeting.* Any action that may be taken at a meeting of Holders may instead be taken by Holders of not less than 50% of the Outstanding Notes (or such other percentage as may be set forth herein with respect to the action being taken) and embodied in and evidenced by one or more written instruments of substantially similar tenor signed by such Holders in person or by agents duly appointed in writing. Any such action shall become effective when such instrument or instruments are delivered to the Issuer.

10. *Restrictions on Transfer Under ERISA.* This Note may not be sold or transferred to (i) any pension or welfare plan (as defined in Section 3 of the Employee Retirement Income Security Act of 1974, as amended (*"ERISA"*)) or to any individual retirement account (as defined in Section 408 of the Internal Revenue Code of 1986, as amended), (ii) any entity the underlying assets of which include "plan assets" by reason of the investment in its entity by one or more pension or welfare plans, or (iii) any person investing "plan assets" of any pension or welfare plan, except:

(a) to the extent such purchase is made by or on behalf of a bank collective investment fund maintained by the purchaser in which at any time while this Note is outstanding no plan, together with any other plans maintained by the same employer or employee organization, has an interest in excess of 10% of the total of all assets in such collective investment fund and the purchase is eligible for exemptive relief under U.S. Department of Labor Prohibited Transaction Class Exemption ("PTCE") 91-38;

(b) to the extent such purchase is made by or on behalf of an insurance company pooled separate account maintained by the purchaser in which at any time while this Note is outstanding no plan, together with any other plans maintained by the same employer or employee organization, has an interest in excess of 10% of the total of all assets in such pooled separate account and the purchase is eligible for exemptive relief under PTCE 90-1;

(c) to the extent such purchase is made by or on behalf of an insurance company general account and the reserves and liabilities for the general account contracts held by or on behalf of any plan, together with any other plans maintained by the same employer or employee organization, do not exceed 10% of the total reserves and liabilities of such general account (exclusive of separate account liabilities) plus surplus as set forth in the insurance company's Annual Statement filed with the state of domicile of the insurer and the purchase is eligible for exemptive relief under PTCE 95-60;

(d) to the extent the decision to make such purchase is made by (i) an investment adviser registered under the Investment Advisers Act of 1940, as amended (the *"Advisers Act"*) which had as of the last day of its most recent fiscal year total assets under its management and control in excess of $50,000,000 and had shareholders' or partners'

equity in excess of $750,000 as shown in its most recent balance sheet prepared in accordance with generally accepted accounting principles, or (ii) a bank as defined in Section 202(a)(2) of the Advisers Act with equity capital in excess of $1,000,000 as of the last day of its most recent fiscal year, or (iii) an insurance company qualified under the laws of more than one state to manage assets with net worth in excess of $1,000,000 as of the last day of its most recent fiscal year and, in any case, such person is otherwise a "qualified professional asset manager" ("*QPAM*"), as such term is used in PTCE 84-14 issued by the Treasury Department, provided such purchase shall not be made for or on behalf of any pension or welfare plan that, together with any other plans maintained by the same employer or employee organization, represents more than 20% of the total client assets managed by such QPAM or if the purchase is not eligible for exemptive relief under PTCE 84-14;

(e) to the extent the decision to make such purchase is made by an investment adviser registered under the Advisers Act which had under its management and control as of the last day of its most recent fiscal year total assets attributable to pension and welfare plans maintained by the affiliates (within the meaning of PTCE 96-23) of such investment adviser in excess of $50,000,000, the pension and welfare plans maintained by such investment adviser and its affiliates had, as of the last day of each plan's reporting year, an aggregate assets of at least $250,000,000, such investment adviser is otherwise an "in-house asset manager" as such term is used in PTCE 96-23, and the purchase is eligible for exemptive relief under PTCE 96-23; or

(f) to the extent such purchase is made by or on behalf of a "governmental plan", as defined in each of Section 3(32) of ERISA and Section 414(d) of the Internal Revenue Code of 1986, as amended.

11. *Governing Law/Submission to Jurisdiction.* This Note shall be governed by, and construed in accordance with, the laws of the State of New York applicable to agreements made and to be enforced in such State. With respect to any suit, action or proceeding arising relating to the Notes ("*Proceedings*"), the Issuer, Guarantor and any Holder irrevocably submits to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, waives the right to a jury trial, waives any objection it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in any inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have jurisdiction over such Issuer, Guarantor or Holder.

12. *No Assignment by Issuer.*

(a) Except as provided in sub-section (b) below, the Issuer shall not assign its obligations under this Note except pursuant to a consolidation or amalgamation with, merger into, transfer of all or substantially all of the Issuer's assets to, or reorganization into another entity where the surviving or transferee entity (the *"Successor Issuer"*) assumes all of the Issuer's obligations arising under or out of this Note and where prior to such transfer the Guarantor confirms in writing that the Guarantee shall remain in full force and effect after such assignment.

(b) The Issuer may transfer any of its interests or obligations under this Note to any subsidiary of the Issuer or any subsidiary of the Guarantor; *provided* that the assignee shall assume all the rights and obligations of the Issuer under this Note and that prior to such transfer the Guarantor shall confirm in writing that the Guarantee shall remain in full force and effect after such assignment.

13. *Notices.* All notices or communications hereunder, except as herein otherwise specifically provided, shall be in writing and delivered, transmitted by facsimile, telexed or telegraphed to the Issuer at 100 Nyala Farm, Westport, Connecticut 06880 (Telephone: 203-222-4700) (Facsimile: 203-222-4780), Attention: Chief Financial Officer (with a copy to the same address, Attention: General Counsel) and to the Holder of this Note at the last registered address set forth in the Note Register. The foregoing address for notices or communications may be changed by written notice given by the addressee to each party hereto, and the addressee's address shall be deemed changed for all purposes from and after the giving of such notice.

14. *Headings.* The section headings herein are for convenience only and shall not affect the construction hereof.

15. *Unconditional Obligation.* No provision of this Note shall alter or impair the obligation of the Issuer, which is absolute and unconditional, to pay the Principal Amount of this Note at the times, place and rate, and in the coin or currency, herein prescribed.

16. *"Business Day" and "Outstanding" Defined.* *"Business Day"* shall mean any day, other than a Saturday or Sunday, that is neither a legal holiday nor a day on which banking institutions are generally authorized or required by law or regulation to close in The City of New York. *"Outstanding"* shall mean for the purposes of the provisions of this Note, any Note authenticated and delivered pursuant hereto shall, as of any date of determination, be deemed to be *"Outstanding"*, except:

(i) Any Note theretofore canceled by the Issuer or delivered to the Issuer for cancellation or held by the Issuer for reissuance but not reissued by the Issuer;

(ii) Any Note that has been called for redemption in accordance with its terms or that has become due and payable at maturity or otherwise, *provided* that all amounts payable in respect thereof have been paid or made available for payment in the manner specified herein; or

(iii) Any Note in lieu of or in substitution for which other Notes shall have been executed and delivered pursuant to the terms hereof;

*provided, however,* that in determining whether the Holders of the requisite aggregate Principal Amount of an Outstanding Note are present at a meeting of the Holders of the Notes for quorum purposes or have consented to or voted in favor of any request, demand, authorization, direction, notice, consent, waiver, amendment, modification or supplement hereunder, any Note owned directly or indirectly by the Issuer or the Guarantor shall be disregarded and deemed not to be Outstanding.