PLEDGE AGREEMENT

PLEDGE AGREEMENT, dated as of March 13, 2000 between J.P. THIERIOT INVESTMENT GROUP, LLC (the "Pledgor") and BANQUE AIG, LONDON BRANCH (the "Bank").

WHEREAS, the Bank and/or certain of its Affiliates (as hereinafter defined) may from time to time enter into derivative and other transactions with the Pledgor, including options transactions effected pursuant to the Master Agreement, to be entered into as of March 14, 2000 (the "Master Agreement"), between the Pledgor and the Bank;

NOW, THEREFORE, to induce the Bank and its Affiliates to enter into such derivative and other transactions (collectively, the "Secured Transactions"), and to secure the Pledgor's obligations thereunder and under this Pledge Agreement (collectively, the "Secured Obligations"), and for other good consideration, the receipt and adequacy of which are hereby acknowledged, the Pledgor and the Bank agree as follows:

1. As collateral security for the performance of the Secured Obligations, the Pledgor hereby pledges and assigns to the Bank, and grants to the Bank a valid first-priority security interest in, (A) the Zero-Coupon Note to be issued by AIG Matched Funding Corp. to the Pledgor on March 14, 2000 and due on June 15, 2000 (the "Note"), all proceeds and products thereof and all dividends, interest and other distributions thereon (whether in cash, additional Securities or otherwise), (B) all options ("Options") purchased by the Pledgor from the Bank under the Master Agreement and all General Intangibles and contract rights of the Pledgor relating to or arising from the Master Agreement or the Options, and (C) all Security Entitlements to the Note and the Options and any other Securities or other Investment Property constituting Collateral hereunder (collectively, the "Collateral"). Capitalized terms used in this Pledge Agreement and not otherwise defined herein shall

have the meanings assigned to such terms in the New York Uniform Commercial Code (the "New York UCC").

2. The Pledgor shall arrange for the Note to be delivered to the Bank in a manner prescribed by Section 8-301 of the New York UCC not later than March 14, 2000. Accordingly, the Pledgor hereby undertakes to irrevocably instruct AIG Matched Funding Corp. to deliver the Note to the Bank upon issuance thereof. The Pledgor further shall deliver to the Bank, or at its instruction, any other Securities, assets or payments it receives that constitute Collateral hereunder promptly after receiving the same. All Securities delivered by the Pledgor hereunder in certificated form shall be in proper form for transfer (as determined by the Bank in its sole discretion) and, if not registered in the name of the Bank or its nominee, shall include stock or bond powers duly endorsed in blank with the Pledgor's signature thereon guaranteed by a bank, broker-dealer, national securities exchange or other entity that is (i) an "Eligible Guarantor Institution" (as defined in Rule 17Ad-15 under the Securities Exchange Act of 1934), (ii) a member of (or participant in) a medallion "signature guarantee program", and (iii) otherwise acceptable to the Bank.

3. The Pledgor represents and warrants that: (i) the Pledgor is duly organized and validly existing as a limited liability company under the laws of the jurisdiction of its organization, (ii) this Pledge Agreement has been duly authorized, executed and delivered by the Pledgor and constitutes a valid and legally binding obligation of the Pledgor enforceable in accordance with its terms, (iii) the pledge and delivery of the Collateral pursuant to this Pledge Agreement will create a valid first-priority lien on and first-priority perfected security interest in the Collateral securing the performance of the Secured Obligations, (iv) it has, and will have upon the deposit of any additional Collateral with the Bank, or the purchase of any additional Options, title to all of the Collateral, free and clear of all claims, mortgages, pledges, liens, encumbrances and security interests of every nature

whatsoever ("Liens") and no Liens other than the Lien created hereby in favor of the Bank exist upon or with respect to any of the Collateral, (v) no consent or approval of any person, entity or governmental or regulatory authority, or of any securities exchange, was or is necessary to create or perfect the Pledgor's pledge of Collateral hereunder and (vi) the execution and delivery of this Pledge Agreement by the Pledgor and the performance by the Pledgor of its obligations hereunder do not violate or conflict with, and will not result in a breach of or default under, any law applicable to it, any of its organizational documents, any order, judgment or decree of any court or other agency or body or any contract, agreement or instrument to which it is a party or affecting any of its assets and will not result in the creation or imposition of a Lien on any of its assets (other than the Lien created hereby).

4. The Pledgor will faithfully defend its title to and preserve and protect the Bank's security interest in the Collateral, will defend the Bank's right, title, lien and security interest in and to the Collateral against the claims and demands of all persons whomsoever, and will do all such acts and things and execute and deliver all such documents and instruments, including without limitation further pledges, assignments, financing statements and continuation statements, as the Bank in its sole discretion may reasonably deem necessary or advisable from time to time in order to preserve, protect and perfect such security interest or to enable the Bank to exercise or enforce its rights under this Pledge Agreement with respect to any Collateral. The Pledgor hereby authorizes the Bank to sign and file financing and continuation statements and Securities and Exchange Commission Form 144s (or similar or replacement forms) without the signature of the Pledgor.

5. The Pledgor will not permit any Liens other than the Lien created hereby in favor of the Bank to exist upon any of the Collateral. Provided that no Event of Default has occurred and is continuing, the Bank agrees that it will not repledge or rehypothecate any of the Collateral.

6. The Pledgor will not take any action that could in any way limit or adversely affect the ability of the Bank to realize upon its rights in the Collateral.

7. At any time and from time to time the Bank may cause all or any of the Collateral to be transferred to or registered in its name or the name of its nominee or nominees.

8. The Bank shall be entitled to exercise all voting power with respect to the Collateral if there shall at any time occur and be continuing an Event of Default or a Potential Default. In the absence of an Event of Default or Potential Default, but without limiting the terms of paragraph 13 hereof, the Bank shall exercise any voting rights it may have in respect of the Note included in the Collateral in accordance with written instructions received by the Bank from the Pledgor reasonably in advance of any deadline for exercising such rights. An "Event of Default" means that any of the following events shall have occurred: (i) any default shall be made by the Pledgor in the performance of the Secured Obligations (including any of its covenants under the Master Agreement or this Pledge Agreement), (ii) an Event of Default or Termination Event with the Pledgor as the Defaulting Party or the Affected Party shall occur under the Master Agreement; or (iii) any representation or warranty made by the Pledgor under the Master Agreement or this Pledge Agreement shall have been when made, or shall become, untrue in any material respect. A "Potential Default" means any fact or circumstance that with notice, lapse of time or both would constitute an Event of Default.

9. If any Event of Default shall occur, the Bank, without obligation to resort to other security, shall have the right at any time and from time to time to sell, resell, assign and deliver, in its discretion, all or any of the Collateral, in one or more parcels at the same or different times, and all right, title and interest, claim and demand therein and right of redemption thereof, on any securities exchange on which the Collateral or any of it may be listed, or at public or private sale, for cash, upon credit or for

future delivery, and in connection therewith the Bank may grant options, the Pledgor hereby waiving and releasing any and all equity or right of redemption to the fullest extent permitted by law. If any of the Collateral is sold by the Bank upon credit or for future delivery, the Bank shall not be liable for the failure of the purchaser to purchase or pay for the same and, in the event of any such failure, the Bank may resell such Collateral. In no event shall the Pledgor be credited with any part of the proceeds of sale of any Collateral until cash payment thereof has actually been received by the Bank. In addition, should any portion of the Collateral consist of a time deposit or deposits with a financial institution (including the Bank), the Bank may terminate such deposit or deposits prior to the maturity thereof and any penalties payable in connection therewith shall be for the sole account of the Pledgor.

10. The Pledgor acknowledges and agrees that the Collateral may decline speedily in value and may consist of Securities or assets that are of a type customarily sold on a recognized market, and, accordingly, no demand, advertisement or notice, all of which are hereby expressly waived, shall be required in connection with any sale or other disposition of any Securities or assets included in the Collateral which may decline speedily in value or which are of a type customarily sold on a recognized market, except any notice that is required under applicable law and cannot be waived. With respect to any other type of Collateral, the Bank shall give the Pledgor at least five business days' prior notice of the time and place of any public sale and of the time after which any private sale or other disposition is to be made, which notice the Pledgor agrees is reasonable, all other demands, advertisements and notices being hereby waived. The Bank shall not be obligated to make any sale of Collateral if it shall determine not to do so, regardless of the fact that notice of sale may have been given. The Bank may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. In the case of all sales

of Collateral, public or private, the Pledgor shall pay all costs and expenses of every kind for sale or delivery, including brokers' and attorneys' fees and all liabilities and advances made or incurred by the Bank in connection with such sale or delivery, and after deducting such costs and expenses from the proceeds of sale, the Bank shall apply any residue first, to the payment of the costs and expenses, including legal fees, incurred by the Bank in connection with the administration and enforcement of the Secured Obligations and this Pledge Agreement and any amounts due to the Bank in respect of the Secured Obligations other than principal or interest and other than settlement payments due upon the exercise or early termination of Options, second, if applicable, to the payment of interest owed with regard to the Secured Obligations, and third, to the payment of principal or other amounts owed with regard to the Secured Obligations. The balance, if any, remaining after payment in full of all such amounts shall be paid to or on the order of the Pledgor.

11. The Pledgor recognizes that the Bank may be unable to effect a public sale of all or a part of the Collateral by reason of certain prohibitions contained in the Securities Act, as now or hereafter in effect, or in applicable Blue Sky or other state securities laws, as now or hereafter in effect, but may be compelled to resort to one or more private sales to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such Collateral for their own account, for investment and not with a view to the distribution or resale thereof. The Pledgor agrees that private sales so made may be at prices and other terms less favorable to the seller than if such Collateral were sold at public sales, and that the Bank has no obligation to delay sale of any such Collateral for the period of time necessary to permit the issuer of such Collateral, even if such issuer would agree, to register such Collateral for public sale under such applicable securities laws. The Pledgor agrees that private sales made under the foregoing circumstances shall be deemed to have been made in a commercially reasonable manner.

12. The Bank shall have the right (but not any obligation), for and in the name, place and stead of the Pledgor, to execute endorsements, assignments or other instruments of conveyance or transfer with respect to all or any of the Collateral.

13. The Bank shall have no duty as to the collection or protection of the Collateral or any income thereon or as to the preservation of any rights pertaining thereto, beyond the safe custody of any thereof actually in its possession. In the absence of an Event of Default or Potential Default, the Bank shall promptly pay over, or cause to be paid over, to the Pledgor any cash dividends actually received by the Bank on any Securities included in the Collateral (other than any such dividend which the Bank, in its good faith discretion, determines was not paid by the issuer of such Securities in the ordinary course of its business or otherwise constitutes an "extraordinary" dividend). With respect to any maturities, calls, conversions, exchanges, redemptions, offers, tenders or similar matters relating to any of the Collateral (herein called "events") occurring prior to an Event of Default or a Potential Default, the Bank's duty shall be fully satisfied if (i) the Bank promptly forwards to the Pledgor any notices the Bank receives, in its capacity as registered holder, of any events applicable to any Securities included in the Collateral which are registered and held in the name of the Bank or its nominee, and (ii) subject to the exercise of its sole discretion (a) the Bank endeavors to take such action with respect to any of such events as the Pledgor may reasonably and specifically request in writing in sufficient time for such action to be evaluated and taken or (b) if the Bank determines that the action requested might adversely affect the value of the Collateral as collateral, the performance of the Secured Obligations, or otherwise prejudice the interests of the Bank, the Bank gives reasonable notice to the Pledgor that any such requested action will not be taken, and if the Bank makes such determination or if the Pledgor fails to make such timely request, the Bank takes such other action as it deems advisable in the circumstances. Except as hereinabove specifically set forth, and at any time following an Event

of Default or a Potential Default, the Bank shall have no further obligation to ascertain the occurrence of, or to notify the Pledgor with respect to, any events and shall not be deemed to assume any such further obligation as a result of the establishment by the Bank of any internal procedures with respect to any Securities in its possession. The Pledgor releases the Bank from any claims, causes of action and demands at any time arising out of or with respect to this Pledge Agreement or the Collateral and/or any actions taken or omitted to be taken by the Bank with respect thereto (except claims, causes of action and demands resulting from the Bank's gross negligence or willful misconduct), and the Pledgor hereby agrees to hold the Bank harmless from and with respect to any and all such claims, causes of action and demands.

14. The Pledgor hereby irrevocably appoints the Bank as the Pledgor's attorney-in-fact for the purpose of carrying out the provisions of this Pledge Agreement and taking any action and executing any instrument which the Bank may deem necessary or advisable to accomplish the purposes hereof. Without limiting the generality of the foregoing, the Bank shall have the right and power to receive, endorse and collect all checks and other orders for the payment of money made payable to the Pledgor representing any interest or dividend or other distribution payable in respect of the Collateral or any part thereof and to give full discharge for the same.

15. The remedies provided herein in favor of the Bank shall not be deemed exclusive, but shall be cumulative, and shall be in addition to all other remedies in favor of the Bank existing at law or in equity. No delay on the part of the Bank in exercising any of its options, powers or rights, or any partial or single exercise thereof, shall constitute a waiver thereof. The pledge of the Collateral hereby shall not in any way preclude or restrict any recourse by the Bank against the Pledgor or any other person or entity liable with regard to the Secured Obligations or any other collateral therefor. Without limitation to the foregoing, the Bank shall have all the rights of a secured party under the New York UCC.

16. If the proceeds of any sale, collection or other realization of or upon the Collateral pursuant to this Pledge Agreement are insufficient to pay in full both any monetary Secured Obligations and the costs and expenses of such realization, the Pledgor shall remain liable to the Bank for such deficiency in its entirety.

17. Upon the repayment in full of all principal, interest and other amounts that may be payable by the Pledgor with regard to the Secured Obligations, the Pledgor shall be entitled to the return of all of the Collateral and of all other property and cash which have not been used or applied toward the payment of such principal, interest and other amounts free and clear of all Liens in favor of the Bank or any encumbrances imposed by the Bank. Except as aforesaid, the assignment by the Bank to the Pledgor of such Collateral and other property shall be without representation or warranty of any nature whatsoever and wholly without recourse.

18. Any notice or demand upon the Pledgor shall be deemed to have been sufficiently given for all purposes thereof if mailed, postage prepaid, by registered or certified mail, return receipt requested, or if delivered, to the Pledgor at the address specified below, or at such other address as the Pledgor may theretofore have designated in writing and given in like manner to the Bank. Any such notice shall be effective when so mailed or delivered.

19. Any waiver, permit, consent or approval of any kind or character on the part of the Bank of any breach or default under this Pledge Agreement or any such waiver of any provision or condition of this Pledge Agreement must be in a writing duly executed by the Bank and shall be effective only to the extent specifically set forth in such writing.

20. This Pledge Agreement may not be assigned, nor may any obligation hereunder be delegated, by the Pledgor without the prior written consent of the Bank, and any purported assignment, or delegation, without such

consent shall be null and void. The Bank may in its discretion transfer its rights and obligations hereunder to any person to whom the Bank transfers its interest and obligations under the Master Agreement. This Pledge Agreement and the rights and obligations of the Bank and the Pledgor hereunder shall be construed in accordance with and governed by the laws of the State of New York, cannot be changed orally and shall bind and inure to the benefit of the Pledgor and the Bank and their respective heirs, distributees, executors, personal representatives and administrators and permitted successors and assigns, and all subsequent holders of the Secured Obligations.

21. This Pledge Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which taken together shall constitute but one and the same instrument.

22. The Pledgor agrees to pay the Bank on demand all costs and expenses, including legal fees, incurred by the Bank in connection with the administration and enforcement of this Pledge Agreement, all of which costs and expenses shall form part of the Secured Obligations as provided above.

23. The Pledgor expressly acknowledges and agrees that the Lien created by this Pledge Agreement shall apply equally for the benefit of any affiliate (each, an "Affiliate") of the Bank that enters into Secured Transactions with the Pledgor. Each Secured Transaction so extended by an Affiliate shall be deemed to be a Secured Obligation hereunder; each such Affiliate shall have the same rights as the Bank in relation to the Pledgor hereunder; the Bank's and each Affiliate's security interest in the Collateral shall rank equally with one another (except, in each such case, as the Bank and such Affiliate may otherwise agree), and the Pledgor's obligations to each Affiliate hereunder shall be the same as his obligations to the Bank hereunder. As used herein, the term "Affiliate" includes American International Group, Inc. and its direct and indirect wholly-owned subsidiaries and any other person

identified by the Bank to the Pledgor in writing as an "Affiliate".

24. With respect to any suit, action or proceeding relating to this Pledge Agreement ("Proceedings"), each of the Bank and the Pledgor irrevocably submits to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

BANQUE AIG, LONDON BRANCH

By: _____

Address:  5th Floor
          One Curzon Street
          London   W1Y 7FN
          United Kingdom

with a copy to:

AIG Financial Securities Corp.
100 Nyala Farm
Westport, CT 06880
Attn:  Chief Financial Officer
       (with a copy to the
       General Counsel)

IN WITNESS WHEREOF, the Pledgor and the Bank have caused this Pledge Agreement to be duly executed and, in the case of the Pledgor, notarized, as of the day and year first above written.

J.P. THIERIOT INVESTMENT GROUP, LLC

By: _____
~~Juan Pablo Thieriot~~
~~Manager~~ RICHARD T. THIERIOT
AUTHORIZED MEMBER

Address:

2111 Turk Street
San Francisco,
~~California~~ 94115

STATE OF California )
                    ) ss.:
COUNTY OF San Francisco )

On the 13th day of March 2000, before me personally came Juan Pablo Thieriot, to me known, who, being duly by me sworn, did depose and say that he is a manager of J.P. Thieriot Investment Group, LLC, the entity described in the foregoing instrument, on whose behalf he executed the foregoing instrument and he acknowledged to me that he executed the same and was authorized to do so.

_____

Mary C. Baldwin
Comm. #1129335
NOTARY PUBLIC CALIFORNIA
City & County of San Francisco
Comm Exp March 11 200_