1  NICOLLE L. JACOBY (admitted *pro hac vice*)
   nicolle.jacoby@dechert.com
2  DECHERT LLP
   30 Rockefeller Plaza
3  New York, NY  10112-2200
   Telephone:  212.698.3500
4  Facsimile:  212.698.3599

5  H. JOSEPH ESCHER III (No. 85551)
   h.joseph.escher@dechert.com
6  FRANCE JAFFE (No. 217471)
   france.jaffe@dechert.com
7  DECHERT LLP
   One Maritime Plaza
8  Suite 2300
   San Francisco, CA  94111-3513
9  Telephone:  415.262.4500
   Facsimile:  415.262.4555

10

   Attorneys for Defendants
11 AIG MATCHED FUNDING CORP.,
   AIG FINANCIAL SECURITIES CORP.,
12 AIG FINANCIAL PRODUCTS CORP.,
   AMERICAN INTERNATIONAL GROUP, INC.,
13 and BANQUE AIG

14

15                  UNITED STATES DISTRICT COURT

16                  NORTHERN DISTRICT OF CALIFORNIA

17                         SAN JOSE DIVISION

18

19 RICHARD T. THIERIOT, an individual,      | Case No. C-07-05069 JW RS

20            Plaintiff,                     | Action Filed:  October 2, 2007

21 v.                                        | REPLY MEMORANDUM IN SUPPORT OF
                                             | DEFENDANTS' MOTION TO DISMISS AND
22 AIG MATCHED FUNDING CORP.,                | STRIKE
   AIG FINANCIAL SECURITIES CORP.,           | (Fed. R. Civ. P. 9(b), 12(b)(6), 12(f))
23 AIG FINANCIAL PRODUCTS CORP.,             |
   AMERICAN INTERNATIONAL                    | Date:      April 7, 2008
24 GROUP, INC., BANQUE AIG, and DOES         | Time:      9:00 a.m.
   ONE THROUGH THIRTY, inclusive,            | Dep't:     Courtroom 8, 4th Floor
25                                           | Judge:     Honorable James Ware
            Defendants.                      |
26

27

28

DECHERT LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**TABLE OF CONTENTS**

Page

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ........................................................................................................................... 1

    I.      PLAINTIFF ADMITS HIS PLEADINGS ARE INSUFFICIENT TO INVOKE THE APPLICATION OF THE "DISCOVERY RULE.".................... 1

    II.     THE WRITTEN CONTRACTUAL DISCLOSURES AGREED TO BY PLAINTIFF BAR HIS CLAIMS. .............................................................. 9

    III.   PLAINTIFF HAS NOT MET THE PARTICULARITY REQUIREMENTS OF RULE 9(b). ................................................................................. 11

    IV.   PLAINTIFF'S CLAIM FOR UNJUST ENRICHMENT FAILS BECAUSE HE HAS NOT ALLEGED ANY FACTS SUFFICIENT TO RESCIND THE CONTRACTS. ....................................................................... 12

    V.    PLAINTIFF'S UCL CLAIM FAILS. .................................................. 13

    VI.   PLAINTIFF WAIVED HIS RIGHT TO JURY TRIAL...................................... 14

CONCLUSION ....................................................................................................................... 15

1

**TABLE OF AUTHORITIES**

2

Page

3

**Cases**

4

*131 Main Street Assocs. v. Manko*,
   897 F. Supp. 1507 (S.D.N.Y. 1995)...................................................................... 8

5

*131 Main Street Assocs. v. Manko*,
   179 F. Supp. 2d 339 (S.D.N.Y. 2002).............................................................. 2, 3, 5

6

*Acebey v. Shearson Lehman Bros., Inc.*,
   No. CV 92-5926-WMB, 1993 U.S. Dist. LEXIS 19659 (C.D. Cal. June 4, 1993) .................... 2

7

*Applied Elastometrics, Inc. v. Z-Man Fishing Prods., Inc.*,
   521 F. Supp. 2d 1031 (N.D. Cal. 2007) .................................................................. 14

8

*Bennett v. Hibernia Bank*,
   47 Cal. 2d 540 (1956) ........................................................................................ 2

9

*Brumbaugh v. Princeton Partners*,
   985 F.2d 157 (4th Cir. 1993)............................................................................ 5, 6

10

*Cardonet, Inc. v. IBM Corp.*,
   No. C-06-06637 RMW, 2007 U.S. Dist. LEXIS 14519 (N.D. Cal. Feb. 14, 2007) ................... 9

11

*Conwill v. Arthur Andersen LLP*,
   12 Misc.3d 1171(A), 2006 N.Y. Misc. LEXIS 1527 (Sup. Ct. N.Y. Cty. 2006)...................... 10

12

*DeMarco v. Lehman Bros. Inc.*,
   309 F. Supp. 2d 631 (S.D.N.Y. 2004)..................................................................... 3

13

*Dodds v. Cigna Sec., Inc.*,
   12 F.3d 346 (2d Cir. 1993)................................................................................. 5

14

*Dunkin v. Boskey*,
   82 Cal. App. 4th 171 (2000) ............................................................................... 13

15

*Fox v. Ethicon Endo-Surgery, Inc.*,
   35 Cal. 4th 797 (2005) ........................................................................ 2, 4, 5, 7, 8

16

*Hodge v. Superior Court*,
   145 Cal. App. 4th 278 (2006) ........................................................................ 14, 15

17

*Huskinson & Brown, LLP v. Wolf*,
   32 Cal. 4th 453, 463 (2004) ............................................................................... 13

18

*Interactive Multimedia Artists v. Superior Court*,
   62 Cal. App. 4th 1546 (1998) ............................................................................. 14

19

*Karl Storz Endoscopy-America, Inc. v. Surgical Techs., Inc.*,
   285 F.3d 848 (9th Cir. 2002) .............................................................................. 14

20

21

22

23

24

25

26

27

28

DECHERT LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Katz v. Zuckerman*,
  481 N.Y.S. 2d 271 (Sup. Ct. Queens Cty. 1984) ................................................................ 12

*McClain v. Octagon Plaza, LLC*,
  159 Cal. App. 4th 784 (2008) ........................................................................................ 10

*McKeown v. First Interstate Bank*,
  194 Cal. App. 3d 1225 (1987) ......................................................................................... 7

*Medimatch, Inc. v. Lucent Techs., Inc.*,
  120 F. Supp. 2d 842 (N.D. Cal. 2000) ........................................................................... 14

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
  382 F. Supp. 2d 411 (S.D.N.Y. 2003) ............................................................................ 10

*Mirman v. Berk & Michaels, P.C.*,
  No. 91 Civ. 8606 (JFK), 1992 U.S. Dist. LEXIS 16707 (S.D.N.Y. Oct. 30, 1992) ................... 5

*Nedlloyd Lines B.V. v. Superior Court*,
  3 Cal. 4th 459 (1992) ..................................................................................................... 9

*O'Brien v. Nat'l Prop. Analysts Partners*,
  719 F. Supp. 222 (S.D.N.Y. 1989) ................................................................................... 2

*Seippel v. Sidley, Austin, Brown & Wood*, LLP,
  399 F. Supp. 2d 283 (S.D.N.Y. 2005) ............................................................................... 6

*Snow v. A.H. Robins Co.*,
  165 Cal. App. 3d 120 (1985) ........................................................................................... 2

*Unpingco v. Hong Kong Macau Corp.*,
  935 F.2d 1043 (9th Cir. 1991) ......................................................................................... 1

**Statutes and Rules**

Fed. R. Civ. P. 9(b) .............................................................................................. 1, 2, 11, 12

Cal. Bus. & Prof. Code §§ 17200 et seq. ("UCL") ................................................... 1, 13, 14, 15

**Other**

W. Stern, *Bus. & Prof. Code §17200 Practice*
  ¶ 5:291 at 5-85 (2007) .................................................................................................... 14

**INTRODUCTION**

Discretely tucked away in a footnote on page nine of the Opposition to the Motion to Dismiss ("Opp'n"), plaintiff Richard Thieriot ("Plaintiff") acknowledges a fatal deficiency in his pleading. Recognizing that he must invoke the delayed discovery rule in order to survive Defendants' statutes of limitations defense to alleged conduct that took place eight years ago, he asserts that he "first learned about AIG's true role in helping to create and promote tax shelters with Arthur Andersen, thanks to information shared by the government with Plaintiff's counsel" in "late 2006" but "*concedes his omission of this allegation in the Complaint*[.]" Opp'n at 9 & n.2 (emphasis added). Rather than provide any details as to what Plaintiff's counsel supposedly learned from the government, Plaintiff weakly suggests that, "if given leave to amend, [Plaintiff] can plead it in detail in a subsequent complaint." Opp'n at 9 n.2. Plaintiff fails to explain why he omitted such crucial details from the Complaint in the first place; or indeed, why he omits them from his Opposition. Nor does Plaintiff remedy the other fundamental problems Defendants identified in their motion to dismiss: the effect of contractual disclosures; the complete lack of pleading particularity required by Federal Rule of Civil Procedure 9(b); the existence of a contract that precludes any claim for unjust enrichment; and the fact that his California Unfair Competition Law ("UCL") claim is barred by the choice of law and/or the statute of limitations.

**ARGUMENT**

**I.**

**PLAINTIFF ADMITS HIS PLEADINGS ARE INSUFFICIENT TO INVOKE THE APPLICATION OF THE "DISCOVERY RULE."**

Effectively conceding that his claims are barred by the applicable statutes of limitations, plaintiff now seeks to invoke the "discovery rule" to delay accrual of his claims and save his case. *See* Opp'n at 9 & n.2 (arguing claims surrounding events in 2000 are timely because Plaintiff did not "suspect . . . AIG's fraud until late 2006" and "conceding his omission of this allegation in the Complaint"). This failure alone justifies dismissal. *See Unpingco v. Hong Kong Macau Corp.*, 935 F.2d 1043, 1046 (9th Cir. 1991) (granting summary judgment where plaintiffs "simply have failed to present, either in their complaint or in [an] affidavit, any facts supporting their

1  contention that the facts constituting the fraud were concealed . . . and they have failed to explain

2  what happened . . . that finally put them on notice").  "[W]henever reasonable minds can draw

3  only one conclusion from the evidence, the question [of accrual and delayed discovery] becomes

4  one of law."  *Snow v. A.H. Robins Co.*, 165 Cal. App. 3d 120, 128 (1985); *see also Acebey v.*

5  *Shearson Lehman Bros., Inc.*, No. CV 92-5926-WMB, 1993 U.S. Dist. LEXIS 19659, at *21-*25

6  (C.D. Cal. June 4, 1993) (statute of limitations and inquiry notice questions properly determined

7  on motion to dismiss where there can be no genuine difference of opinion as to impact of notice

8  on a reasonable person).

9       In order to invoke the discovery rule, a plaintiff "must specifically plead facts to show (1)

10  the time and manner of discovery *and* (2) the inability to have made earlier discovery despite

11  reasonable diligence."  *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 808 (2005) (internal

12  quotation marks omitted); *see also Bennett v. Hibernia Bank*, 47 Cal. 2d 540, 563 (1956)

13  (allegations regarding discovery rule must "afford the court  means of determining whether or not

14  the discovery of the asserted invasion was made within the time alleged, that is, whether plaintiffs

15  actually learned something they did not know before"); *131 Main Street Assocs. v. Manko*, 179 F.

16  Supp. 2d 339, 346-47 (S.D.N.Y. 2002) (party seeking to avoid dismissal with discovery rule must

17  show (1) fraudulent concealment of injury either by showing defendant took affirmative steps to

18  prevent plaintiff from discovering injury or that wrong was of such nature as to be self-

19  concealing; (2) ignorance of cause of action; and (3) exercise of due diligence).  Not only does

20  Plaintiff admit that his Complaint omits all such facts (Opp'n at 9 n.2), his failure to even

21  describe such facts also suggests that he cannot meet this burden if given leave to amend.[1]

22       In *131 Main Street*, the district court denied plaintiffs leave to amend their complaint to

23

24  [1]  As with any fraud-based claim, Plaintiff also would have to meet the particularity requirements
    of Federal Rule 9(b) in order to sufficiently plead the delayed discovery/fraudulent concealment

25  doctrine.  Plaintiff wholly fails to do so.  *See* Point III, *infra*; *see also O'Brien v. Nat'l Prop.
    Analysts Partners*, 719 F. Supp. 222, 231-32 (S.D.N.Y. 1989) (requiring plaintiff specifically

26  identify which individual defendant in multi-defendant case committed which acts of
    concealment to dissuade plaintiff from filing suit because "a plaintiff may not use fraudulent

27  concealment by one defendant as a basis for tolling the statute of limitations against another
    defendant who did not engage in affirmative fraudulent acts to conceal").

28

1    plead fraudulent concealment in order to establish that their RICO claim was not time-barred.

2    179 F. Supp. 2d at 354.  The court concluded that such an amendment would be futile because

3    even though the defendants in fact concealed the fraud, plaintiffs could not as a matter of law

4    establish the other elements of fraudulent concealment.  Plaintiffs were not diligent in

5    investigating possible claims after learning the IRS issued an audit report "that presented what

6    should have been alarming statements regarding the company." *Id.* at 350.  Despite receipt of the

7    report, plaintiffs failed to respond to the IRS to challenge its contents and also failed to

8    investigate whether the report presented any cause of concern.  Upon receipt of the report,

9    lawyers representing the partnership did not investigate the content of the IRS report but

10   concentrated solely on defending the partnership in the IRS proceeding. *Id*. at 351.  Plaintiffs,

11   having failed to establish that they investigated the issues raised by the IRS notice, could not

12   establish they were diligent in researching their claims. *Id.*

13          The same rule should require dismissal here.  Plaintiff argues that the April 13, 2004 IRS

14   Notice of Final Partnership Administrative Adjustment ("April 2004 Notice") did not put Plaintiff

15   on notice of any potential fraud because "there are many reasons, other than fraud on the part of

16   [a tax shelter's] managers and trading partners, for an investment in a tax shelter limited

17   partnership to become worthless and for its associated tax deductions to be disallowed by the

18   IRS" (Opp'n at 8 (internal quotation marks omitted)).  This does not rescue Plaintiff's claims.[2]

19   Plaintiff alleges in the Complaint that the transaction "was simply marketed as a sound

20   investment strategy that provided additional, legal tax benefits" (Compl. ¶ 12), that Plaintiff did

21   not know that the transaction "was an abusive tax shelter or would be characterized as an abusive

22   tax shelter" (Compl. ¶ 16), and that he "reasonably relied on the tax advice, investment advice

---

23   [2]  Plaintiff cites *DeMarco v. Lehman Bros. Inc*., 309 F. Supp. 2d 631, 637 (S.D.N.Y. 2004) for the
24   proposition that knowledge of injury does not necessarily trigger knowledge of the existence of
     deceit.  *See* Opp'n at 8-9.  However, in *DeMarco*, unlike here, the plaintiff alleged specific details
25   of fraud that allowed the court to evaluate his delayed discovery argument, including allegations
     that the defendant issued research reports which recommended purchase of a stock; that on a
26   specific date the SEC subsequently released emails that revealed this recommendation was false;
     and *quoting the emails* released by the SEC that showed the defendant did not, in fact, believe the
27   stock deserved a "buy" rating. 309 F. Supp. 2d at 634, 635, 637.  Unlike Plaintiff here, the
28   *DeMarco* plaintiff met the particularity requirements of Rule 9(b).  *See* Point III, *infra*.

and professional services rendered by defendants" (Compl. ¶ 19).  However, the IRS rejected all of these contentions in its April 2004 Notice:

- "It is determined that Parrott Enterprises, LLC was a sham, lacked economic substance, and . . . was formed or availed of in connection with a transaction . . . a principal purpose of which was to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent" of the law (RJN Ex. 1, Exhibit A thereto at 12 (Explanation of Items) ¶ 1);

- Plaintiff did not establish the transactions "were entered into for profit" or that he had "the requisite profit intent" (*Id.* at 13 (Explanation of Items) ¶¶ 6, 7);

- "the adjustments of partnership items . . . are attributable to a tax shelter for which no substantial authority has been established for the position taken, and for which there was no showing of reasonable belief . . . that the position taken was more likely than not the correct treatment of the tax shelter and related transactions" (*id.* at 13 ¶ 8); and also noting,

- "It should not be inferred . . . that fraud penalties will not be sought on any portion of an underpayment subsequently determined to be attributable to fraud or that prosecution for criminal offenses will not be sought . . ." (*Id.*).

Plaintiff does not deny that he received this notice or understood the importance of its contents.  At a minimum, he therefore understood no later than April 13, 2004 that the IRS was taking the very positions he now uses to support his fraud claim.  A reasonable person would have inquired into the matter after learning that the IRS believed that the transaction was a sham, an abusive tax shelter, that Plaintiff had no "good faith" basis for claiming the deductions, and that he was at risk of criminal fraud prosecution.  In other words, he had inquiry notice of his potential fraud claim against the entities who were involved in the transaction, whether or not he knew their identity or the precise facts linking those entities to the alleged misrepresentation claim.  *See Fox*, 35 Cal. 4th at 808-09 (in order to invoke the discovery rule, "a potential plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable investigation of all potential causes of that injury.  If such an investigation would have disclosed a factual basis

1    for a cause of action, the statute of limitations begins to run on that cause of action when the

2    investigation would have brought such information to light"); *Dodds v. Cigna Sec., Inc*., 12 F.3d

3    346, 352 (2d Cir. 1993) ("[T]he issue is not whether [the investor] was given inadequate

4    information about the advisability of investments in multiple limited partnerships but whether she

5    had constructive notice of facts sufficient to create a duty to inquire further into the matter"); *131*

6    *Main Street*, 179 F. Supp. 2d at 352, 354 (rejecting plaintiff's suggestion that "actual knowledge

7    of the claim is necessary to bar the tolling of the statute of limitations" because "all that is

8    necessary is that [p]laintiffs have some suspicion of the fraud" which plaintiff should have had

9    when he received IRS report suggesting defendant's activities were fraudulent); *Mirman v. Berk*

10   *& Michaels, P.C*., No. 91 Civ. 8606 (JFK), 1992 U.S. Dist. LEXIS 16707, at *9-*10 (S.D.N.Y.

11   Oct. 30, 1992) (concluding that investor could not claim delayed discovery because "[a]n IRS

12   inquiry into an investment partnership intended as a tax shelter would raise the suspicions of a

13   person of ordinary intelligence and thus give rise to his duty to inquire further").

14          *Brumbaugh v. Princeton Partners*, 985 F.2d 157 (4th Cir. 1993) is directly on point.  In

15   that case, an investor in a limited partnership sued the promoters of the transaction after the IRS

16   disallowed claimed tax losses upon concluding that the partnership was an illegal tax shelter.  985

17   F.2d at 160-61.  To support his common law fraud claim, the investor alleged that the private

18   placement memorandum that had described the limited partnership failed to reveal that the

19   partnership would not be treated as such for tax purposes and that the transaction was a sham.  *Id.*

20   In order to explain why he had waited until 1990 to file suit and avoid the statute of limitations,

21   the plaintiff alleged that he did not know that the 1982 transaction was fraudulent until 1988

22   when the investor received the IRS report concluding that the limited partnership was a sham.  *Id.*

23   at 161.  The district court granted the motion to dismiss on statute of limitations grounds; plaintiff

24   appealed, arguing that the district court should have applied the discovery rule.  The Fourth

25   Circuit affirmed, concluding that the plaintiff's eight-year old claims should be dismissed

26   regardless of whether the discovery rule applied because he had not been diligent in investigating

27   his claims:

28          Inquiry notice is triggered by evidence of the possibility of fraud,

> not by complete exposure of the alleged scam.  Merely bringing suit after the scheme has been laid bare through the efforts of others, in this case the IRS, will not satisfy the requirements of due diligence when there have been prior warnings that something was amiss.
>
> The PPM contained a host of prior warnings making it plain that [plaintiff] was purchasing, to put it mildly, a highly speculative investment.  [Plaintiff] is charged with constructive knowledge of the contents of the PPM. . . . [which] specifically warned of the possibility that the IRS would disallow the tax deductions that flowed from the investment.  That risk came to pass—and now, in hindsight, [plaintiff] claims that he was defrauded.
>
> Equity would not be served by tolling the limitations periods in this case.  The PPM put [plaintiff] on inquiry notice of the violations he now charges.

*Brumbaugh*, 985 F.2d at 162 (citations omitted).

The April 2004 Notice put Plaintiff on notice of all the elements of his fraud, unjust enrichment and Unfair Competition Law claims, yet he chose to do nothing – he did not sue Arthur Andersen, Sidley, AIG, or any fictitious defendants.[3]  Instead, he waited until October 2007 to sue the AIG defendants, whose supposed liability he claims to have discovered sometime in "late 2006."  This was too late.  Plaintiff's proffered excuse for the delay – ignorance of the facts regarding AIG's alleged participation – is belied by the allegations of the Complaint.  The Complaint alleges that Plaintiff was harmed by Defendants' representation that the transaction was "legitimate" and "lawful," which was controverted when the IRS subsequently determined

---

[3]  Plaintiff hired Preston Gates & Ellis to represent him in the Tax Court proceedings no later than July 2004 (RJN Ex. 1), but he does not allege that he or his attorneys investigated the tax shelters, or contemplated suing Arthur Andersen or Sidley at that time.  Nor does Plaintiff allege that, after receipt of the April 2004 Notice, the AIG defendants gave him any assurances that would have lulled him into sitting on his rights.  For this reason, the authorities cited by Plaintiff in which the defendant specifically reassured the plaintiffs as to the validity of the defendants' prior advice, thereby lulling the plaintiffs into inaction, are inapplicable here.  *See, e.g.*, *Seippel v. Sidley, Austin, Brown & Wood*, LLP, 399 F. Supp. 2d 283, 291 (S.D.N.Y. 2005) (concluding that warning signs in IRS notice were negated by words of comfort from defendants assuring plaintiff that the notice did not apply to their transactions, and thus plaintiff was not on "inquiry notice" of his claims).  Plaintiff alleges that Sidley assured him that IRS Notice 2000-44 did not apply to his transactions (Compl. ¶ 24), but he never alleges that AIG gave such assurances; more important, he does not allege that any entity involved with the transactions gave him any assurances after he received the April 2004 Notice.  Even applying the logic of *Seippel*, Plaintiff cannot argue that AIG lulled him into complacency after he received the April 2004 Notice.

1    that the transactions were not legitimate and imposed penalties. *See, e.g.*, Compl. ¶¶ 28, 38. In

2    his Opposition, Plaintiff focuses entirely on the allegation that AIG concealed its role in "creating

3    and promoting" the transaction and "passed itself off as a 'neutral' bank, not a promoter of tax

4    shelters connected with Arthur Andersen and Sidley." Opp'n at 11. But the Complaint does not

5    allege a separate injury was caused by Plaintiff's ignorance of the details of AIG's role – it

6    alleges that Plaintiff was injured because the transaction did not have the tax benefits Arthur

7    Andersen and Sidley claimed it would provide.[4]

8        As in *McKeown v. First Interstate Bank*, 194 Cal. App. 3d 1225, 1229 (1987), the IRS'

9    position in its April 2004 Notice put Plaintiff on notice that there was a problem with his

10    investment, and also had a "direct bearing on the truth of [Defendants'] specific representations"

11    (Opp'n at 11).[5] The April 2004 Notice put Plaintiff on notice that his advisors' positions were

12    disavowed by the IRS. It is irrelevant that the IRS did not name AIG, or that Plaintiff allegedly

13    did not know all of the supposed facts about AIG's involvement. *See Fox*, 35 Cal. 4th at 807

14    ("The discovery rule . . . allows accrual of the cause of action even if the plaintiff does not have

15    reason to suspect the defendant's identity. The discovery rule does not delay accrual in that

16    situation *because the identity of the defendant is not an element of a cause of action*") (citations

17    omitted and emphasis added).

18    _____

19    [4] The only allegation Plaintiff asserts that differs from the allegations against Arthur Andersen or
     Sidley is the unsupported mischaracterization of the fees paid by AIG to Arthur Andersen (which
     were disclosed in the ISDA Master Agreement) as "kick-back" fees. *See* Compl. ¶ 13; *see also*

20    Opp'n at 16 n.6 (acknowledging that ISDA Master Agreement discloses AIG paid fees to Arthur
     Andersen).

21
     [5] Plaintiff correctly points out that *McKeown*'s holding does not determine when a plaintiff

22    should know the essential facts of a claim, but only when "appreciable harm" occurs. *See* Opp'n
     at 10-11; *McKeown*, 194 Cal. App. 3d at 1228. However, the *McKeown* court's discussion and

23    the cases cited therein conflate the concept of when the harm occurs and when a plaintiff should
     know he has sustained such harm: "[W]hen the appellant received the notice of tax deficiency . . .

24    we are of the opinion that any reasonable and prudent man . . . would have known or certainly
     should have known at that time, that he had sustained legal harm as of that date, if not before."

25    *Id*. at 1230 (internal quotation marks omitted). Plaintiff alleges he purchased a tax shelter and
     was defrauded because his investment did not deliver the promised benefits; receipt of the April

26    2004 Notice would have made "any reasonable and prudent man" investigate the issue. Plaintiff

27    does not allege that either he or his Preston, Gates & Ellis lawyers investigated the issue,
     contacted Defendants, or received any assurances from Defendants.

28

1    For that same reason, Plaintiff's reliance on *131 Main Street Associates v. Manko*, 897 F.

2   Supp. 1507 (S.D.N.Y. 1995) for the proposition that IRS notices of disallowance do not provide

3   notice of potential fraud claims pertaining to parties who were not named in the notice (Opp'n at

4   11-12) is misplaced.  Rather than focus on the *identity* of a third party, that decision focuses on

5   the distinction between transactions that are "sham in substance" and "sham in fact."  897

6   F. Supp. at 1518-19.  The issue there was whether an IRS notice gave plaintiffs notice of a

7   particular *type* of injury.  *Id.*  The court concluded that the IRS notice gave plaintiffs notice that

8   the government believed that the transactions at issue were "sham in substance."  897 F. Supp. at

9   1519.  The IRS notice did not, however, give notice that the underlying trades, on which the tax

10   shelters were meant to be premised, were never in fact made by the defendant third party and

11   were entirely fictitious:  "It is one thing, for example, for the IRS to say that [a transaction] was

12   not sufficiently profit-motivated to merit the claimed tax treatment.  It is another thing for the IRS

13   to say that the claimed sales and purchases of commodities cannot be recognized because they

14   never in fact occurred."  *Id.* at 1518.  Until the investors learned that the transactions had not

15   occurred at all, they had no basis to suspect the "third party" who was supposed to be executing

16   the transactions of wrongdoing, and thus the claim did not accrue until the investors had reason to

17   know about the fictitious transactions.[6]  Plaintiff here does not allege that AIG never completed

18   the transactions or somehow did not fulfill its obligations as outlined in the governing contracts;

19   he only alleges that the transactions were "sham in substance."  That is the very same injury he

20   could have diligently investigated when he received the April 2004 Notice.  All of Plaintiff's

21   claims, under either the New York or California statutes of limitations[7], therefore are time-barred.

22   _____

23   [6]  *Fox*, 35 Cal. 4th at 811 (Opp'n at 9) makes the same point.  In that case, the California Supreme
     Court held that the statute of limitations for product liability claims was tolled to allow a bariatric

24   surgery patient to sue the manufacturer of a surgical staple after she discovered, in the course of
     deposing the surgeon in her (timely-filed) medical malpractice case, that the surgeon had used a

25   particular type of staple and suspected the staple had malfunctioned.  Until the deposition, the
     Supreme Court reasoned, the plaintiff had no cause to suspect any element of a product liability

26   claim, and thus could not know the identity of any product liability defendant such as the staple
     manufacturer.

27   [7]  Plaintiff contends that New York law does not apply to tort claims because such claims do not

28   "arise out of" the ISDA Master Agreement containing the choice of law clause.  *See* Opp'n at 3.

## II.

### THE WRITTEN CONTRACTUAL DISCLOSURES AGREED TO BY PLAINTIFF BAR HIS CLAIMS.

Plaintiff is a wealthy, experienced investor who, with the assistance of various advisors, chose to enter into a series of highly sophisticated transactions for the purpose of hedging the value of his concentrated stock position, deriving investment income, and securing some form of tax advantage. *See* Opp'n at 1; *see also* RJN Ex. 1 at §6(a) (describing Plaintiff as "a full time investor for over 25 years"), §6(b)-(m) (describing purposes of transaction). He, or someone acting on his behalf, executed more than sixty documents with Defendants to achieve those goals. *See* MPA at 3 n.1; Strauch Decl. Exs. A-F. The ISDA Master Agreement represents that Plaintiff consulted with financial, tax and legal advisors. *See* MPA at 4-5. Plaintiff confirms in his Opposition that that is exactly what he did. *See* Opp'n at 1 (Plaintiff consulted with his advisors at Arthur Andersen and obtained a legal opinion from a recommended, nationally known law firm), 9 (Plaintiff "relie[d] heavily on others, such as accountants and attorneys, as alleged here"), 11 ("Arthur Andersen and Sidley provided advice to Plaintiff about the tax consequences of the transaction").

There is no reason not to enforce the contractual provisions Plaintiff now seeks to evade. Plaintiff therefore is contractually estopped from at least the following: claiming that AIG advised him regarding the transaction; from denying that he had sufficient knowledge, experience and access to professional advice to make his own legal, tax, accounting and financial evaluation of the merits and risks of the transaction and reviewed the transaction with his advisors; denying that he is solely responsible for determining and evaluating the consequences of the transaction; claiming that AIG should have understood and/or guaranteed the effectiveness of the transaction

---

That is contrary to the position taken by the California Supreme Court. *See* Memorandum of Points and Authorities in Support of Motion to Dismiss and Strike ("MPA") at 8-10 (citing *Nedlloyd Lines B.V. v. Superior Cour*t, 3 Cal. 4th 459, 469 (1992)); *see also Cardonet, Inc. v. IBM Corp*., No. C-06-06637 RMW, 2007 U.S. Dist. LEXIS 14519, at *6-*17 (N.D. Cal. Feb. 14, 2007) (concluding parties' choice of New York law was enforceable as to all their claims, including fraud and UCL claims). Regardless of which law applies, however, all of Plaintiff's claims should be dismissed.

1    as a tax strategy; and claiming he did not know that AIG paid fees to Arthur Andersen for its

2    assistance in that transaction, in prior similar transactions, and may do so again in the future. *See*

3    MPA at 4-6 (quoting from ISDA Master Agreement).  Plaintiff's attempt to deflect the impact of

4    *Conwill v. Arthur Andersen LLP*, 12 Misc.3d 1171(A), 2006 N.Y. Misc. LEXIS 1527 (Sup. Ct.

5    N.Y. Cty. 2006) fails.  *See* Opp'n at 18 n.7.  The *Conwill* court did dismiss the plaintiff's breach

6    of fiduciary duty claim based on the contractual disclaimer, but it also dismissed his claims for

7    fraud, negligent misrepresentation and fraudulent inducement against the defendant because

8    "[w]here no fiduciary duty is implied by law, contractual disclaimers may be given effect, and

9    enforced in accordance with their terms." *Id.* at *12.  Thus, *Conwill* is precisely on point.

10        Plaintiff's abstract argument that "boilerplate" disclaimers cannot insulate defendants

11    from their own fraud (Opp'n at 17) is misplaced.  In *McClain v. Octagon Plaza, LLC*, 159 Cal.

12    App. 4th 784, 793 (2008), the defendant landlords misstated the square footage of a property and

13    dissuaded plaintiff from measuring it herself.  When plaintiff sued, the defendants attempted to

14    use the lease's disclaimers, which included representations that the plaintiff had the opportunity

15    to examine and measure the property, to bar her misrepresentation claims. *Id.* at 794.  The court

16    disagreed, concluding that the defendants' verbal assurances and dissuasion from measuring the

17    property established justified reliance on their representations. *Id.* at 798.  Unlike in *McClain*,

18    Plaintiff does not allege that Defendants made any misrepresentations that were contrary to the

19    "boilerplate" disclaimers or offered "assurances" that the disclaimers were accurate.  In other

20    words, Defendants are not seeking to rely on the disclaimers in order to bar the use of parol

21    evidence.  The situation is more analogous to *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 382

22    F. Supp. 2d 411, 416-18 (S.D.N.Y. 2003), a case Plaintiff also cites.  There, the district court

23    explained that "it is settled in New York that where a party specifically disclaims reliance upon a

24    representation in a contract, that party cannot, in a subsequent action for fraud, assert it was

25    fraudulently induced to enter into the contract by the very representation it has disclaimed.

26    However, a disclaimer is generally enforceable only if it tracks the substance of the alleged

27    misrepresentation." *Id.* at 417 (citations and internal quotation marks omitted).  Even though the

28    district court concluded that the disclaimer at issue was "general" and did not track the alleged

1    misrepresentation, it nonetheless concluded that the disclaimer should be given effect because it

2    was between sophisticated parties and negotiated at arms' length.  *Id.* at 417-18.

3         In the case at bar, the disclaimers not only were between sophisticated parties and

4    negotiated at arms' length, but they do specifically track the substance of the alleged

5    misrepresentations.  *See* MPA at 4-8.  For example, the disclaimers state that AIG did not provide

6    any tax or legal advice to Plaintiff regarding the transactions and that Plaintiff relied on his own

7    counsel to decide whether to enter into the transactions.  Strauch Decl. Ex. A, Schedule §5(f)(v),

8    (vi).  Plaintiff claims AIG misled him as to the viability of a tax shelter.  Compl. ¶¶ 11-12, 16, 28.

9    Similarly, the disclaimers state that AIG paid Arthur Andersen for this and other similar

10   transactions.  Strauch Decl. Ex. A, Schedule §5(f)(viii).  Plaintiff claims AIG did not disclose it

11   paid fees to Arthur Andersen and that this was not a transaction unique to Plaintiff.  Compl.

12   ¶¶ 13-14, 17-18.  The disclaimers preclude Plaintiff from arguing that AIG had a duty to disclose

13   anything more than it did, or that AIG concealed or misrepresented any material fact.

14                                    **III.**

15   **PLAINTIFF HAS NOT MET THE PARTICULARITY REQUIREMENTS OF RULE 9(b).**

16        The allegations Plaintiff identifies as sufficient to meet the stringent requirements of

17   Federal Rule of Civil Procedure 9(b) (Opp'n at 15-16 (citing Compl. ¶¶ 12-13, 15-17, 20, 23, 25,

18   28)) fall far short of providing the who, what, where and when of any misrepresentation by AIG.

19   *See* MPA at 15-16.  Paragraph 12 alleges that AIG documentation "contributed to the appearance

20   and semblance" of the transaction "as a legitimate investment strategy" but it fails to identify

21   what documentation was misleading, or how it misled Plaintiff; any claim that Plaintiff relied on

22   AIG's documentation to invest in the transaction is also foreclosed by the disclaimers in the ISDA

23   Master Agreement.  Paragraph 13 alleges, *on information and belief*, that AIG helped create,

24   coordinate, promote and facilitate the transaction; paid "kick-back" fees to Arthur Andersen; and

25   helped set up the limited partnerships that were formed to carry out the transactions.  But any

26   fraud allegation made on information and belief must be accompanied by a statement disclosing

27   the basis for the Plaintiff's information and belief.  *See* MPA at 16.  Paragraph 15 accuses AIG of

28   having failed to register the transaction as a tax shelter, but Plaintiff does not allege that AIG (as

1   opposed to Arthur Andersen) had a duty to so register the transactions (and such allegation would

2   be contradicted by the ISDA Master Agreement).  Paragraph 16 discusses Sidley, not AIG.

3   Paragraph 17 accuses AIG of creating documentation that gave the transaction the false

4   semblance of being a legitimate investment, omitted mention of "kick-back" fees or that the

5   transaction was an abusive tax shelter.  These allegations are either contradicted by the ISDA or

6   not sufficiently pleaded because they do not identify the documentation at issue or allege how the

7   documentation was misleading.  Paragraphs 20, 23 and 25 accuse AIG of knowing that the

8   transaction would be deemed an abusive tax shelter but nonetheless marketing them to Plaintiff

9   and numerous others.  Interestingly, Plaintiff does not plead these allegations on information and

10  belief, even though he now alleges that he obtained this information from an unidentified

11  government official in "2006".  *See* Opp'n at 2 & 9 n.2.  In any event, Plaintiff explicitly

12  disclaimed any reliance on AIG for tax or investment advice.  Finally, paragraph 28 alleges that

13  AIG "made numerous knowingly false affirmative representations and intentional omissions of

14  material fact" through its documentation but Plaintiff still refuses to identify the documentation

15  he alleges was misleading.  This is insufficient to sustain a fraud claim.  *See* MPA at 15-16.

16                                      **IV.**

17  **PLAINTIFF'S CLAIM FOR UNJUST ENRICHMENT FAILS BECAUSE HE HAS NOT**
    **ALLEGED ANY FACTS SUFFICIENT TO RESCIND THE CONTRACTS.**
18

19          Plaintiff's contention that the contracts with AIG are "illegal" does not save his unjust

20  enrichment claim.  Plaintiff has not pleaded rescission as a remedy, nor has he pleaded any facts

21  sufficient to bring about rescission of his agreement with AIG.  *See* Point III, *supra* (fraud claims

22  must be pleaded with particularity).  Thus, the contract is not "unenforceable" or "void", and

23  Plaintiff cannot seek to recover for unjust enrichment.  *See* MPA at 20-22.

24          The cases Plaintiff cites all support the uncontroversial proposition that a party who

25  performed a service for another should not be deprived of just payment for work performed even

26  if the contract that guaranteed those fees is found to be illegal.  For example, *Katz v. Zuckerman*,

27  481 N.Y.S. 2d 271 (Sup. Ct. Queens Cty. 1984) held that a doctor who entered into an illegal fee-

28  splitting agreement with medical technicians should still be able to collect fees for the valuable

1   services he rendered to the technicians under an unjust enrichment theory.  Similarly, the court in

2   *Huskinson & Brown, LLP v. Wolf*, 32 Cal. 4th 453, 460-61, 463 (2004), held that a lawyer whose

3   fee sharing agreement was illegal should not be entitled to the referral fee guaranteed by the

4   illegal contract, but was nonetheless entitled to recover the value of the legal services he

5   performed under a *quantum meruit* theory so that the attorneys to whom he referred the case were

6   not unjustly enriched.  In *Dunkin v. Boskey*, 82 Cal. App. 4th 171, 196-98 (2000), the court

7   concluded that even though a contract promising a non-biological father custody and visitation

8   rights was void for public policy, the father could sue the mother for unjust enrichment after she

9   terminated the relationship and refused to give him parental rights.  None of these decisions has

10  any application to Plaintiff's apparent intent to undo a contract whose terms were in fact fully

11  performed by AIG.  The terms of the ISDA Master Agreement called for AIG to perform options

12  transactions.  Plaintiff, in his Tax Court case, claims that the options transactions were "without

13  regard to tax benefits" and intended as an investment and hedge vehicle.  *See* RJN Ex. 1 § 6(k)

14  ("The Thieriot family believed that in entering into the transactions that they had a reasonable

15  opportunity to earn a profit, in excess of all fees and transaction costs from the transactions

16  without regard to tax benefits, and also to hedge against a collapse in the value of the Thieriot

17  family assets").  There is no allegation in the Complaint that the investment and hedge aspects of

18  the transactions were not accomplished, or that AIG failed to perform any of the obligations set

19  forth in the ISDA Master Agreement.

## V.

### PLAINTIFF'S UCL CLAIM FAILS.

22      The Court need not resolve the choice of law issue[8] because even if California law did

23  apply, Plaintiff's UCL claim would be barred by the applicable statute of limitations.  Plaintiff

24  suggests that it is "unsettled" whether the discovery rule applies to UCL claims.  *See* Opp'n at 22

25  n.11.  The vast majority of courts that have considered the issue, including the Ninth Circuit,

---

[8]  While Plaintiff cites an unpublished decision in support of his contention that the UCL claim is viable despite the parties' choice of New York law, the better-reasoned cases, including the more recent and/or published cases, support AIG's position.  *See* MPA at 22 and cases cited therein.

1  however, are in accord that the discovery rule does not toll the statute of limitations for such

2  claims.  *See* W. Stern, *Bus. & Prof. Code §17200 Practice* ¶ 5:291 at 5-85 (2007) ("The

3  'discovery rule' does not apply to UCL claims") (citing numerous cases, including *Karl Storz*

4  *Endoscopy-America, Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 857 (9th Cir. 2002) (holding that

5  UCL claims not subject to discovery rule)); *see also Medimatch, Inc. v. Lucent Techs., Inc.*, 120

6  F. Supp. 2d 842, 861 (N.D. Cal. 2000) (citing cases for the proposition that the discovery rule

7  does not apply to UCL claims and concluding plaintiff's UCL claim was time-barred).  Because

8  AIG's last act was to execute the 2000 transactions Plaintiff now argues were unfair, his UCL

9  claim accrued at the latest on that date, and the statute of limitations expired nearly four years

10  ago, in 2004.[9]

## VI.

### PLAINTIFF WAIVED HIS RIGHT TO JURY TRIAL.

13      "The right to a jury trial in federal court is governed by federal law and, under federal law,

14  parties may contractually waive their right to a jury trial."  *Applied Elastometrics, Inc. v. Z-Man*

15  *Fishing Prods., Inc.*, 521 F. Supp. 2d 1031, 1044 (N.D. Cal. 2007).  Plaintiff executed contracts

16  in which he specifically and unambiguously waived his right to jury trial.  *See* Strauch Decl. Ex.

17  A, Schedule §4(k).  California policy notwithstanding, he waived his right to jury trial on all

18  claims.  Moreover, the waiver is not based on a "choice of law" (Opp'n at 24), but on a specific

19  contractual provision in a contract that the parties chose to be governed and construed by New

20  York law.  Thus, the choice of law analysis does not extend to the validity of the jury waiver

21  clause, which is valid under New York law.

22      Even if the Court did conclude that California law barred the jury waiver clause, there is

23  no right to jury trial under California law for equitable claims.  *See Interactive Multimedia Artists*

24  *v. Superior Court*, 62 Cal. App. 4th 1546, 1556 (1998); *Hodge v. Superior Court*, 145 Cal. App.

---

26  [9]  Because Plaintiff has not pleaded an unfair competition law claim under New York law, AIG
27  will not address whether such a claim would be timely (Opp'n at 22).  However, AIG will note
    that Plaintiff has not sufficiently pleaded any facts to support his fraudulent concealment
28  argument.  *See* n.1 and Point III, *supra*.

1    4th 278, 284-85 (2006) (holding there is no right to jury trial in UCL cases). Thus, regardless of

2    what law applies, or of the enforceability of the jury waiver, Plaintiff is not entitled to trial by jury

3    on his unjust enrichment or UCL claims.

**CONCLUSION**

5        The motion to dismiss and strike should be granted, without leave to amend.

7    Dated: March 24, 2008                   NICOLLE L. JACOBY
8                                           H. JOSEPH ESCHER III
                                       FRANCE JAFFE
9                                           DECHERT LLP

11                        By:         /S/
                               FRANCE JAFFE
12                                  Attorneys for Defendants
                               AIG MATCHED FUNDING CORP.,
13                                  AIG FINANCIAL SECURITIES CORP.,
                               AIG FINANCIAL PRODUCTS CORP.,
14                                  AMERICAN INTERNATIONAL
                               GROUP, INC., and BANQUE AIG

16   13132414.4

DECHERT LLP
ATTORNEYS AT LAW
SAN FRANCISCO