LUKENS LAW GROUP
WILLIAM M. LUKENS (SBN 037196)
JENNIFER L. JONAK (SBN 191323)
One Maritime Plaza, Suite 1600
San Francisco, CA 94111
Telephone: (415) 433-3000
Facsimile: (415) 781-1034

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD T. THIERIOT, an individual.<br><br>Plaintiff,<br><br>v.<br><br>AIG MATCHED FUNDING CORP., a corporation; AIG FINANCIAL SECURITIES CORP., a corporation; BANQUE AIG, a corporation; AIG FINANCIAL PRODUCTS CORP., a corporation; AMERICAN INTERNATIONAL GROUP, INC., a corporation; and DOES ONE THROUGH THIRTY, inclusive;<br><br>Defendants. | Case No. C-07-5069 JW (RS)<br><br>**FIRST AMENDED COMPLAINT FOR FRAUD, UNJUST ENRICHMENT AND UNFAIR BUSINESS PRACTICES**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff hereby alleges as follows:

## JURISDICTION AND VENUE

1. This is an action for damages for fraud, unjust enrichment and unfair business practices.

2. The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the opposing parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to this action occurred in this District; and pursuant to 28 U.S.C. § 1391(a)(3) because one or more of the defendants is subject to personal jurisdiction in this District and there is no district in which the action may otherwise be brought.

## PARTIES

4. Plaintiff Richard T. Theiriot is an individual and a United States citizen residing at all relevant times in the State of California, within the Northern District of California.

5. Defendant AIG Matched Funding Corp. is a Delaware corporation with its principal place of business located in Wilton, Connecticut. On information and belief, it is involved in banking and investment transactions throughout the United States, including the Northern District of California. It purposefully established contacts with California in participating in the Son of BOSS transactions, as described below.

6. Defendant AIG Financial Securities Corp. is a Delaware corporation with its principal place of business located in Wilton, Connecticut. On information and belief, it is involved in banking and investment transactions throughout the United States, including the Northern District of California. It purposefully established contacts with California in participating in the Son of BOSS transactions, as described below.

7.  Defendant Banque AIG is a French corporation with its principal place of business located in Paris, France. On information and belief, it is involved in banking and investment transactions throughout the world, including the United States and specifically the Northern District of California. It purposefully established contacts with California in participating in the Son of BOSS transactions, as described below.

8.  Defendant AIG Financial Products Corp. is a Delaware corporation with its principal place of business located in Wilton, Connecticut. AIG Matched Funding Corp., AIG Financial Securities Corp. and Banque AIG are subsidiaries of AIG Financial Products Corp. On information and belief, AIG Financial Products Corp. is involved in banking and investment transactions throughout the United States, including the Northern District of California. It purposefully established contacts with California through its involvement and/or the involvement of its subsidiaries in the Son of BOSS transactions, as described below.

9.  Defendant American International Group, Inc. is a Delaware corporation with its principal place of business located in New York, New York. AIG Financial Products Corp. is a subsidiary of American International Group, Inc. On information and belief, American International Group, Inc. is involved in banking and investment transactions throughout the United States, including the Northern District of California. It purposefully established contacts with California through its involvement and/or the involvement of its subsidiary in the Son of BOSS transactions, as described below. All of the AIG defendants shall be referred to collectively as "AIG."

10. Plaintiff is uncertain of the true names and capacities of certain individuals or entities that may be liable for the damages alleged herein and therefore sues them by fictitious names of Does ONE through THIRTY. Plaintiff will amend this complaint by asserting their true names, capacities and appropriate charging allegations when they are ascertained.

**GENERAL ALLEGATIONS**

11. Plaintiff brings this action against AIG for its role in promoting and

FIRST AMENDED COMPLAINT (Case No. C-07-5069 JW (RS))
3

implementing tax strategies that the federal government has determined to be abusive and unregistered tax shelters, including one known as "Son of BOSS," and inducing Plaintiff to purchase and utilize the Son of BOSS tax strategy on the premise that the strategy was lawful. Son of BOSS has been rejected by federal and state tax agencies, as defendants knew it would be, but due to defendants' misconduct alleged herein, Plaintiff was induced into purchasing it, not knowing that it was a sham transaction or an abusive tax shelter.

12.  In early 2000, Mr. Thieriot was presented in San Francisco by his long-time tax and investment advisor at Arthur Andersen LLP ("Arthur Andersen") with an investment strategy that later became known as "Son of BOSS." At the time that Plaintiff considered and entered the strategy, however, it was never referred to by this name and was simply marketed as a sound investment strategy that provided additional, legal tax benefits. Plaintiff paid approximately $7 million for the Son of BOSS transaction, which monies, on information and belief, were split among Arthur Andersen and the defendants. For purposes of this complaint, the transaction will be referred to as the "Son of BOSS." The documentation for the Son of BOSS, which was presented to Plaintiff after a presentation in San Francisco, California, contributed to the appearance and semblance of the Son of BOSS as a legitimate investment strategy. Plaintiff, however, was misinformed and misled about the nature and soundness of the Son of BOSS strategy, which in fact, has been determined by the IRS to be an abusive and illegal tax shelter. Plaintiff has been assessed approximately $56 million in back taxes, interest and penalties as a result. Plaintiff is informed and believes and therefore alleges that defendants knew that the Son of BOSS was a sham that would not be recognized by federal or state taxing authorities for income tax purposes, yet facilitated this strategy and helped induce them to purchase it in order to generate enormous fees for themselves. Had Plaintiff suspected that the transaction would be considered a sham or an abusive tax shelter by the IRS, Plaintiff would never have entered into it.

13.  On information and belief, the Son of BOSS program was developed by Kurt Nelson of AIG Financial Products Corp. ("AIGFP") beginning in

November of 1999, in conjunction with partners at Arthur Andersen in the San Francisco Bay area. AIGFP knew at the time it developed and implemented Son of BOSS that it was a tax-motivated program that was not likely to have any economic benefit. AIG closed three Son of BOSS programs during the last week of December 1999 and three more closed in the first quarter of 2000.

14.     On February 7, 2000, Plaintiff entered into a consulting agreement with Arthur Andersen for an investment transaction that he later discovered was a Son of BOSS tax shelter. Throughout Plaintiff's transaction, AIG purported to act as a third party neutral that was simply providing banking and investment services for the Son of BOSS transaction, when in fact, as described above, AIG helped create, coordinate, promote and facilitate the Son of BOSS in order to generate at least $1.8 million in fees from Plaintiff's transaction alone. AIG also received fees in the form of "kick-back" referrals from Arthur Andersen, which compromised AIG's role as a neutral broker and was concealed from Plaintiff. Defendants also helped structure, set up and/or advise limited liability companies that were formed for the express purpose of the Son of BOSS strategies, despite the IRS' later determination that such limited liability companies were "shell" companies created solely to further fraudulent tax shelter activity.

15.     The Son of BOSS tax shelter program was implemented by Kurt Nelson, Amy Donohue and Jake DeSantis at AIGFP through various subsidiaries of AIGFP, including defendants Banque AIG, AIG Matched Funding Corp, and AIG Financial Securities Corp. On information and belief, Robert Powell, Douglas Poling and Richard Fabbro of AIGFP were also involved in the development of documentation and legal analysis of the Son of BOSS transactions. Banque AIG was the counterparty to a series of options transactions entered into by Plaintiff on or about March 14, 2000, a series of agreements dated March 13, 2000 whereby the AIG Matched Funding zero coupon notes were pledged to Banque AIG, and a series of assignments effective March 28, 2000, all of which were integral elements of the sham tax shelter sold to Plaintiff, but which were designed to give the transaction the false appearance of a legitimate and legal

FIRST AMENDED COMPLAINT (Case No. C-07-5069 JW (RS))
5

business investment. Banque AIG documents were executed by Paul Campbell, Executive Director of Banque AIG's London branch. All of these documents and transactions implemented and executed by the various AIG defendants were part of the fraud described herein, which was to pass off an abusive tax shelter as a legitimate investment. On information and belief, defendants Banque AIG, AIG Matched Funding Corp. and AIG Financial Securities Corp. conspired with AIGFP to carry out the fraud based upon the monies that would accrue to AIG as a result, and thereby affirmed and abetted the acts of AIGFP described herein.

16. Premiums from the options spread and additional monies constituting the fees paid directly from Plaintiff to AIG were invested, pursuant to a series of purchase agreements with AIG Matched Funding dated March 14, 2000, in zero coupon notes that were likewise issued by AIG Matched Funding on March 14, 2000 and guaranteed by American International Group, Inc. The documents were signed by Kathleen Furlong, treasurer for AIG Matched Funding Corp. The fees paid by Plaintiff to the AIG entities were paid to AIG Matched Funding through these "investments." Despite Plaintiff's good faith in making these investments and paying these fees to the AIG defendants, on information and belief, each of them knew in implementing the Son of BOSS transaction that it did not have economic substance and was not likely to be accepted by the IRS for income tax purposes. In spite of this, none of these AIG defendants disclosed this information to Plaintiff and instead deliberately concealed this information from him in order to induce him to pay millions of dollars in fees.

17. On information and belief, defendants sold numerous of these Son of BOSS strategies to other clients and directed their tax shelter activities complained of herein toward residents of California through Arthur Andersen, whose office was based in San Francisco, California, knowing that the fraudulent tax shelters would have an impact on the Son of BOSS clients' state tax returns, as well as federal tax returns. This included at least approximately six other clients from Arthur Andersen's San Francisco office. Although defendants' "clients" on certain of Son of BOSS documents were listed as

limited liability companies, in fact, the real clients were the taxpayers, who were individuals and residents of California. Defendants knew in these transactions that the actual clients were California residents based on paperwork containing detailed information about the taxpayer client. As a result, defendants knew that the transactions, which they structured to "shelter" taxes, would impact these California residents' state income taxes and have a substantial impact on California tax returns and revenues paid to the Franchise Tax Board of the State of California.

18.     Ultimately, defendants failed to register Plaintiff's Son of BOSS transaction as a tax shelter, as required by law, nor is Plaintiff aware of defendants registering any of the other transactions in which they were involved that have been listed as abusive tax shelters.

19.     Plaintiff had no knowledge that the Son of BOSS strategy sold to him was an abusive tax shelter or would be characterized as an abusive tax shelter. This is because, in addition to the documentation prepared by AIG and other information provided to Plaintiff about the Son of BOSS strategy, which made it appear to be a sound investment strategy with lawful tax benefits, Plaintiff received opinion letters from the law firm of Brown & Wood LLP, now known as Sidley Austin LLP ("Sidley), which opined that Plaintiff's transaction had lawful tax benefits that were likely to be recognized by the IRS. On information and belief, Sidley provided similar opinion letters in boilerplate form to at least 14 other Arthur Andersen clients, collecting over $1.4 million in fees from the opinion letters alone. On information and belief, the provision of opinion letters for the Son of BOSS transactions were a substantial source of revenue to Sidley. Plaintiff is informed and believes and therefore allege that defendants were all aware of Sidley's vested interest in the promotion of the Son of BOSS strategy, yet never advised Plaintiff that the transaction sold to Plaintiff had been marketed to others and that the opinion letters were mass generated. Kenneth Mandel, in particular, who worked closely with Kurt Nelson, had a relationship with one of the attorneys at Sidley who has now been indicted for tax shelter fraud and was the author of over 600 boilerplate opinion letters,

collecting over $30 million in fees for said letters. Robert A. McCaskill was also aware of the fact that Sidley was issuing boilerplate opinion letters to support the tax shelter programs being marketed by AIG and Arthur Andersen. On information, based upon the close working relationship and history of Son of BOSS transactions between these individuals, AIGFP was aware of the boilerplate nature of the letters, and in implementing AIGFP's transactions, its subsidiaries and Banque AIG, the other AIG defendants, were aware that the opinion letters were mass generated and not customized, as represented to Plaintiff. Despite this, the AIG defendants failed to disclose this to Mr. Thieriot. In fact, Plaintiff was specifically advised that the strategy sold to him was a customized, unique investment strategy, and as a result, Plaintiff did not know until long after he had purchased the transaction that the strategy had a tax shelter name or was mass marketed to others, or that the opinion letter provided to him was one of numerous boilerplate letters that had been pre-arranged between AIGFP and Sidley. AIGFP knew this and, on information and belief, its subsidiaries, including Banque AIG, also knew of it based upon their work with AIGFP on other tax shelters, in which the same opinion letters would have been used, yet they failed to disclose this to Plaintiff.

20.     Based upon defendants' documentation, which gave the Son of BOSS transaction the false semblance of a legitimate and legal business investment, materially omitting any mention of kick-back fees or that it would be considered by the IRS as an abusive tax shelter, Plaintiff signed, in California, boilerplate documentation presented to them in connection with the Son of BOSS facility. This paperwork was voluminous and highly technical, and it was presented to Plaintiff for signature without any negotiation of any venue, jurisdiction or choice of law clauses contained therein. On information and belief, all of this paperwork was created by defendants with the express intention of promoting and inducing Plaintiff to enter into a fraudulent strategy that defendants designed to avoid the payment of lawfully due taxes. The contracts contained therein had an illegal purpose and are therefore void for illegality.

21.     At no time did any of the defendants disclose to Plaintiff that they

had been active in promoting, marketing, developing and/or facilitating Son of BOSS, or that they had received kick-back fees for their involvement in Plaintiff's Son of BOSS transaction. In fact, Kurt Nelson of AIGFP specifically instructed Arthur Andersen not to disclose its fees to any "independent advisors" of a tax shelter client, claiming that AIG's "pricing" was "proprietary and absolutely confidential." In this manner, AIGFP not only intentionally omitted disclosure of this information to Plaintiff and other tax shelter clients, but it prevented Plaintiff and other clients from obtaining that information from others involved in the transactions, thereby deliberately concealing the pricing and kickback scheme, as well as the role of the AIG defendants in the scheme.

22.     Plaintiff reasonably relied on the tax advice, investment advice and professional services rendered by defendants.

23.     Defendants knew and/or had reason to know at the time Plaintiff purchased Son of BOSS, and in developing, promoting and/or facilitating the Son of BOSS, that the Son of BOSS transactions would be considered by the IRS as a tax shelter within the meaning of Code Section 6111(c)(1), and that they were illegally promoting, and aiding and abetting the promotion, of an unregistered tax shelter.

24.     Prior to the time that the Son of BOSS was promoted to Plaintiff, the IRS had issued Notice 1999-59, published on December 27, 1999, entitled "Tax Avoidance Using Distributions of Encumbered Property," and warning that the IRS had become aware of certain types of transactions "being marketed to taxpayers for the purpose of generating tax losses." IRS Notice 1999-59 warned that such transactions consisted of a "contrived series of steps" by which "taxpayers claim tax losses for capital outlays that they have in fact recovered." IRS Notice 1999-59 stated that such "artificial losses" are not allowable for federal income tax purposes.

25.     On September 5, 2000, the IRS published Notice 2000-44, entitled "Tax Avoidance Using Artificially High Basis," addressing similar transactions to Notice 1999-59. Notice 2000-44 described a similar inflated basis transaction, concluding that "purported losses from these transactions (and from any similar arrangements designed to

FIRST AMENDED COMPLAINT (Case No. C-07-5069 JW (RS))
9

produce noneconomic tax losses by artificially overstating basis . . . ) are not allowable as deductions for federal income tax purposes."

26.    As a result of IRS Notices 1999-59 and 2000-44, defendants knew and/or had reason to know that the Son of BOSS transaction was not a legitimate or legal means for declaring capital losses for income tax purposes for Plaintiff. Among other things, defendants knew that the Son of BOSS sold to Plaintiff was not the customized, unique transaction that had been marketed to him, but had, in fact, been marketed to numerous others, including other clients of Arthur Andersen. Part of the problem with the transaction and its inability to be recognized by the IRS for income tax purposes was the mass-generated nature of the strategy and opinion letters supporting this. Despite this, defendants failed to inform Plaintiff of the illegality of the Son of BOSS tax shelter scheme, or of its boilerplate nature, and, in fact, promoted and provided documentation that made it appear to the contrary.

27.    On February 23, 2001, Sidley provided a further opinion letter to Mr. Thieriot advising him that, even with the issuance of Notice 2000-44, the IRS would likely recognize any losses resulting from Plaintiff's Son of BOSS strategy. Based on defendants' concealment of the fact that the strategy had been marketed to numerous taxpayers and was not unique or customized, Plaintiff reasonably believed that the tax benefits from his Son of BOSS were legal and legitimate.

28.    Defendants knew and/or had reason to know that their promotion and facilitation of the Son of BOSS strategy, by providing documentation reinforcing the allowability of any tax benefit obtained through participation in Son of BOSS and by facilitating or providing a gross valuation overstatement concerning the tax and investment benefits of the Son of BOSS, constituted a violation of I.R.C. § 6700.

29.    Plaintiff's 2000 tax returns have since been audited by the IRS, with the IRS taking the position that losses from the Son of BOSS facility are not allowable for income tax purposes. The State of California Franchise Tax Board has also disallowed the use of losses from Son of BOSS for state income tax purposes. On

information and belief, defendants knew and anticipated that the fraudulent tax shelters that they promoted, including Plaintiff's Son of BOSS, would have an impact on federal as well as state – California – tax returns, depriving those governments of substantial revenues.

### FIRST CAUSE OF ACTION

### Fraud

### (Against All Defendants)

30. Plaintiff reasserts and incorporates by reference all of the foregoing general allegations in their entirety and further alleges:

31. In order to induce Plaintiff to pay millions of dollars in fees for the Son of BOSS transaction, defendants made numerous knowingly false affirmative representations and intentional omissions of material fact to Plaintiff, including, but not limited to: creating and assisting in the preparation and dissemination of documentation to make the Son of BOSS transaction appear to be a legitimate business strategy with lawful tax benefits, when, in fact, it was a transaction with no economic substance and was designed merely to create tax losses; creating documentation to make the Son of BOSS transaction appear to be a customized and unique transaction created specifically for Plaintiff, when, in fact, it was a strategy mass-marketed to numerous other clients and taxpayers; concealing from Plaintiff the mass-market nature of the Son of BOSS strategy; concealing from Plaintiff the knowledge that Sidley's opinion letters had been mass-generated; concealing from Plaintiff their knowledge and/or reasons to suspect that the IRS would not approve losses from Son of BOSS transactions for income tax purposes; concealing AIG's involvement in creating the Son of BOSS strategy; and concealing the kick-back fees paid by Arthur Andersen and/or others to induce defendants to participate in the transaction, which kick-back fees compromised their independence and duties to Plaintiff.

32. The above affirmative representations, or material and intentional omissions or concealments of fact, made by defendants were false when made and

defendants knew them to be false when made with the intention that Plaintiff rely upon them in entering into the Son of BOSS transaction, so that the defendants could reap enormous fees from the transaction.

33.   As a direct and proximate result of the foregoing, Plaintiff has been injured by the $7 million in fees and commissions charged for the transaction, the loss of use of funds caused by the payment of said fees, the payment of taxes that otherwise could have been invested in tax-beneficial investments, the payment of penalties and interest, the loss of use of funds for payment of taxes, penalties and interest, the payment of attorney's fees and other costs in response to the IRS' audit of the transaction, and such other damages and loss of property as Plaintiff has sustained and will continue to sustain in an amount to be determined at trial.

34.   Plaintiff is informed and believes and on that basis alleges that defendants' conduct was willful, malicious, reckless, wanton and in knowing disregard of their professional obligations, such that Plaintiff is entitled to recover exemplary damages against defendants in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Unjust Enrichment

### (Against All Defendants)

35.   Plaintiff reasserts and incorporates by reference all of the foregoing general allegations in their entirety and further alleges:

36.   Plaintiff paid approximately $7 million in fees for the Son of BOSS transaction.

37.   Despite this payment, defendants failed to provide Plaintiff with a legitimate business investment with lawful tax benefits, as promised, instead concealing and misrepresenting material facts about the Son of BOSS transaction as described herein.

38.   As a direct and proximate result of the foregoing, defendants have been unjustly enriched by having received the benefit of fees for a transaction that was not as represented to Plaintiff and that defendants knew or should have known to be illegal,

and having unjustly retained said fees paid by Plaintiff at the expense of Plaintiff.

## THIRD CAUSE OF ACTION

### Unfair Business Practices, Cal. Bus. & Prof. Code § 17200

### (Against All Defendants)

39. Plaintiff reasserts and incorporates by reference all of the foregoing general allegations in their entirety and further alleges:

40. The Unfair Business Practices Act defines unfair business competition to include any "unfair," "unlawful," or "fraudulent" business act or practice. California Business & Professions Code §17200 *et seq.*

41. Defendants have violated the Unfair Business Practices Act by engaging in the unlawful, unfair and/or fraudulent business acts and/or practices alleged herein alleged herein, including the promotion, facilitating, concealment and/or sale of the Son of BOSS, a transaction that they knew or had reason to know would be disallowed by the IRS as a tax shelter, and would be likely to deceive Plaintiff, as well as numerous other individuals and members of the public of the State of California, thereby depriving the public of millions of dollars of tax monies and deceiving taxpaying members of the public into participating in what the IRS deems an illegal tax shelter.

42. As a direct and proximate result of the foregoing, Plaintiff has been injured by the fees and commissions charged for the transaction, the loss of use of funds caused by the payment of said fees, the payment of taxes that otherwise could have been invested in tax-beneficial investments, the payment of penalties and interest, the loss of use of funds for payment of taxes, penalties and interest, the payment of attorney's fees and other costs in response to the IRS' audit of the transaction, and such other damages and loss of property as Plaintiff has sustained and will continue to sustain in an amount to be determined at trial.

43. The Unfair Business Practices Act provides for restitution for violations. Plaintiff thereby requests that this Court restore all monies and fees paid by him related to the Son of BOSS transaction.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment against defendants as follows:

1.   Against all defendants, joint and severally, for actual damages in an amount to be proven at trial.

2.   Against all defendants, an injunction enjoining defendants from engaging in the same types of conduct or endeavor alleged herein; devising, offering and soliciting clients for, or promoting, tax shelters; preparing tax returns involving tax shelters; providing legal advice promoting tax shelters; soliciting clients for, referring clients to, or engaging in marketing or business development programs, with each other; sharing fees or income with each other; and otherwise for the purpose of frustrating or defeating the collection of legitimate taxes;

3.   Against all defendants, a declaration that defendants are jointly and severally liable to Plaintiff for any and all commissions paid, interest, and penalties assessed in the past or future against them by the IRS and/or California tax authorities resulting from Plaintiff's participation in the Son of BOSS program, for the loss of use of funds to Plaintiff, and for all professional fees incurred by Plaintiff in the past or the future to rectify defendants' wrongdoing;

4.   Against all defendants, jointly and severally, for attorneys' fees and costs to the maximum extent provided by any applicable provision of law;

5.   Against all defendants for restitution of all fees and commissions paid by Plaintiff; and

FIRST AMENDED COMPLAINT (Case No. C-07-5069 JW (RS))
14

6. For such other and further relief as the Court may deem just or proper.

Dated: May 23, 2008

LUKENS LAW GROUP
WILLIAM M. LUKENS (State Bar No. 037196)
JENNIFER L. JONAK (State Bar No. 191323)


By: _____
Attorneys for Plaintiff


**JURY TRIAL IS HEREBY DEMANDED**